PRINCESS HOUSE, INC., Plaintiff-Appellant,

v.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS of the State of Wisconsin, Viola Stanford and Dianne Giebel Elmer, Defendants-Respondents.†

Court of Appeals

*No. 80–2357. Submitted on briefs August 6, 1981.— Decided December 28, 1981.*
(Also reported in 314 N.W.2d 922.)

† Petition to review granted. CALLOW, J., took no part.

744

For the plaintiff-appellant the cause was submitted on the briefs of *Frank J. Daily* and *Matthew J. Flynn* and *Quarles & Brady,* of Milwaukee, and *Carl H. Amon, Jr.,* and *Hale & Dorr* of Boston, MA, of counsel.

For the defendants-respondents the cause was submitted on the briefs of *Thomas E. Smith,* of Madison.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

GARTZKE, P.J.   Princess House, Inc. appeals from a circuit court judgment affirming the decision of the

Labor and Industry Review Commission, which in turn affirmed an appeal tribunal decision, that Princess House is liable for contributions to the Wisconsin unemployment compensation fund. We affirm.

Princess House is a Massachusetts corporation. It manufactures and sells tableware nationally. A system of local dealers, grouped under unit and area organizers, accounts for most of the company's sales.[1]

The appeal tribunal found that the company's dealers were employees within the meaning of sec. 108.02(3), Stats. 1973, and that they did not come within the statutory exceptions from that status. The tribunal found that Princess House was a Wisconsin employer and was liable for contributions beginning January 1, 1974. The Labor and Industry Review Commission affirmed. The circuit court found that credible evidence of record supported the findings of the commission and affirmed the decision.

1. *Statute And Employer's Contentions*

Section 108.02(3), Stats. 1973, provides in material part:

(a) "Employe" means any individual who is or has been performing services for an employing unit, in an employment, whether or not he is paid directly by such employing unit; except as provided in par. (b). . . .

(b) Paragraph (a) shall not apply to an individual performing services for an employing unit if the employing unit satisfies the department as to both the following conditions:

1. That such individual has been and will continue to be free from the employing unit's control or direction over the performance of his services both under his contract and in fact; and

2. That such services have been performed in an independently established trade, business or profession in which the individual is customarily engaged.

. . . .

---

[1] Although the tribunal referred in its findings to "consultants," we generally use "dealers."

The company regards the dealers as independent contractors. Its agreement with a dealer provides, "The Company agrees to sell to the Dealer and the Dealer agrees to buy from the Company the Company's products for the purpose of resale to the Dealer's customers . . . ." The dealer signs a separate agreement stating that she understands she is in business for herself and is not an agent or employee of Princess House.[2]

Princess House contends that its dealers do not perform services for the company because it and its dealers occupy the relation of supplier and purchasers rather than employer and employees. It argues that each transaction it has with a dealer is complete when its product is sold to the dealer, and that the dealer's services are for the dealer's benefit and not for the benefit of Princess House. It argues that a dealer performs no service for a supplier merely by buying the seller's products.

2. *Finding That Employees Perform Services For Princess House Supported By Credible And Substantial Evidence*

Sales by Princess House dealers account for over ninety percent of the company's business. The party plan is most often used. Under that method, the dealer takes the orders and forwards them to the company. The shipment is subsequently made by the company C.O.D. to the hostess or another person rather than to the dealer. The company is paid by the hostess rather than the dealer, who later receives a commission. According to its chairman of the board, the company will take care of a customer complaint sent in by the dealer. The dealer, however, receives and forwards the complaint.

The dealer's services are of course partly for the dealer's own benefit. The fact remains that every sale

---

[2] The agreement and other forms consistently use the feminine pronoun in references to the dealer. The dealers who testified at the hearing were women.

through the party method is a sale to a customer arranged by the dealer, which almost immediately benefits the company. The dealer provides both pre-sale and post-sale services to the company.

The finding that the dealer performs services for the company is supported by credible and substantial evidence, the scope of our review under sec. 102.23(6), Stats., which is made applicable by sec. 108.09(7)(b), Stats., to review a decision by the commission under ch. 108.

■

Princess House contends that the evidence merely demonstrates the practice of "drop shipping." It is a common commercial practice for a buyer and seller to arrange for a C.O.D. shipment by the seller to a consignee other than the buyer. That such an arrangement may exist does not compel the commission to find that such was the arrangement here. A reasonable person could have drawn the same inference from the evidence as did the commission. We must therefore adopt the commission's inference. *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d 408, 418, 280 N.W.2d 142, 147 (1979).

■

Princess House relies upon *Aparacor, Inc. v. United States,* 556 F.2d 1004 (Ct. Cl. 1977), which held, on similar facts, that Aparacor was a supplier to independent contractors. *Aparacor* is not in point. The question in *Aparacor* was whether the relationship of employee or independent contractor existed under the usual common law tests under the Internal Revenue Code. 556 F.2d at 1005. The question here is whether Princess House dealers are employees, as statutorily defined. A person may be an independent contractor at common law but an employee under the Unemployment Compensation Act. *Moorman Mfg. Co. v. Industrial Comm.,* 241 Wis. 200, 203, 5 N.W.2d 743, 744 (1942).

### 3. Exemptions From Employee Classification

The dealers having been shown to be employees as defined by sec. 108.02(3)(a), Stats. 1973, the burden is on the company to establish that they are exempt from that classification. The dealers are not exempt unless both conditions set forth in sec. 108.02(3)(b) exist. Whether those conditions exist is a question of fact. *Transport Oil, Inc. v. Cummings,* 54 Wis. 2d 256, 267, 195 N.W.2d 649, 655 (1972).

We need not decide whether credible and substantial evidence supports the commission's findings that the company failed to establish that its dealers in fact were not free from its control and direction. Sec. 108.02(3)(b)1, Stats. 1973. Credible and substantial evidence supports the commission's finding that the services of the dealers were not performed in an "independently established trade, business or profession." Sec. 108.02(3)(b)2. The company has therefore failed to meet the second of the two conditions of sec. 108.02(3)(b).

The "proprietary-interest" test is a guideline in determining whether services are performed in an independently established trade, business or profession. *Sears, Roebuck & Co. v. ILHR Department,* 90 Wis. 2d 736, 751, 280 N.W.2d 240, 246 (1979); *Transport Oil, supra.* Under that guideline, an independently established trade, business or profession is one in which the person possesses an interest which that person alone controls and is able to sell or give away. *Sears, Roebuck & Co.,* 90 Wis. 2d at 751, 280 N.W.2d at 246; *Transport Oil,* 54 Wis. 2d at 266, 195 N.W.2d at 655.

The most convincing evidence as to the existence of a proprietary interest is whether dealers have indeed sold their businesses to other persons. No evidence was offered of such sales. One or two dealers have assigned scheduled shows or parties to other dealers for a pro-

rata share of the proceeds. Although those assignments may have constituted sales of individual business opportunities, they did not involve sales of entire businesses, as such.

The company has paid $8,950 to dealers in Wisconsin and $184,800 to consultants across the United States upon termination of their dealerships. The "purchases" are made in accordance with a standing written offer by the company to acquire the "consultant's business equity" upon retirement or death. The company purchases only the dealer's business records. The price is prefixed by a schedule. The price ranges from $100 if the dealer's purchases from the company during the year preceding death or retirement were between $5,000 and $7,499, to a maximum of $1,000 if the dealer's purchases were $15,000 or more. The company pays the dealer or her estate the same payment she would have received on continuing "heirloom club" sales previously made had she not retired or died. The dealer may sell her sample kit and transfer future booked shows to any other dealer, for which she or her estate will receive forty percent of the net profits.

The termination payments do not show that the dealers possess a proprietary interest in their dealership. No value is placed by the company upon the dealership itself. No value is placed on the dealer's records, independently of the fixed schedule. No evidence was offered that a dealer has sold her business (other than booked shows) or records to any person other than the company.

The dealers who testified do not have separate places of business. They do not advertise as Princess House dealers. None of the Princess House dealers was a dealer for another company at the time of the hearing. The tangible business assets of the dealers appear to be negligible. They use their personal cars. One of the seven

who testified maintains a "small inventory" and another keeps heirloom club replacements on hand. One or two dealers buy items wholesale to give to hostesses or other dealers as incentives and may have temporary inventories of those items. Order forms, records and sample kits make up the balance of the usual tangible business assets of a dealer.

Taking into account the credible and substantial evidence in view of the entire record, the commission's finding as to the lack of a trade, business or profession is reasonable.

Because Princess House dealers are employees as defined by sec. 108.02(3), Stats. 1973, and because the company failed to establish the existence of both exempting conditions set forth in sec. 108.02(3)(b), the judgment will be affirmed, unless the company's remaining contentions have merit.

### 4. Dealer Eligibility And Employer Contribution Calculations

Princess House argues that its dealers can never be laid off. Under the dealer contract, the company may terminate a dealership only if the dealer engages in deceptive practices, fraudulent misrepresentations or violations of state or federal law. Princess House therefore contends that its dealers can never qualify for unemployment compensation.

Whether an employee is potentially eligible for benefits is immaterial, however, in determining the liability of the employer under ch. 108, Stats. 1973. *Hanmer v. ILHR Department,* 92 Wis. 2d 90, 100, 284 N.W.2d 587, 591 (1979), and cases cited.

The company points out that under sec. 108.18(1)(a), Stats. 1973, the unemployment tax contribution of an employer is calculated on the basis of the employer's pay-

roll. The company contends it has no payroll and therefore its dealers are not subject to the act.

The commission did not determine the method of calculating the company's contribution. When and if the commission renders a decision as to the amount of a contribution payable by the company, the question raised will be ripe for judicial review. Meanwhile, we will not decide a hypothetical issue. *Pension Management, Inc. v. DuRose*, 58 Wis. 2d 122, 128, 205 N.W.2d 553, 555–56 (1973).

*By the Court.*—Judgment affirmed.