PRINCESS HOUSE, INC., Plaintiff-Appellant-Petitioner,

v.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS of the State of Wisconsin, Leola Stanford and Dianne Giebel Elmer, Defendants-Respondents.

Supreme Court

*No. 80–2357. Argued November 20, 1982.—Decided March 1, 1983.*

(Also reported in 330 N.W.2d 169.)

For the plaintiff-petitioner there were briefs by *Frank J. Daily* and *Matthew J. Flynn,* Milwaukee; *Quarles & Brady,* Milwaukee, of counsel; and *Carl H. Amon, Jr.,* and *Hale & Dorr,* Boston, Massachusetts, of counsel; and oral argument by *Frank J. Daily* and *Matthew J. Flynn.*

For the Department of Industry, Labor and Human Relations there was a brief and oral argument by *Thomas E. Smith,* Madison.

Amicus curiae brief of the Direct Selling Association was filed by *Ronald E. Stauffer, Deborah T. Ashford* and *Hogan & Hartson,* Washington, D.C.; *Jack R. DeWitt, Douglas L. Flygt* and *DeWitt, Sundby, Huggett & Schumacher, S.C.,* Madison.

HEFFERNAN, J.   This is a review of a court of appeals decision which affirmed a judgment of the circuit court for Dane county, Richard W. Bardwell, Circuit Judge, upholding the decision of the Labor and Industry Review Commission and the underlying determination

of its appellate tribunal that Princess House is subject to the provisions of the Wisconsin Unemployment Compensation Act and must make contributions to the unemployment compensation fund. We affirm the decision of the Court of Appeals.[1]

Sec. 108.02(3), Stats., determines an employing unit's liability to make contributions to the fund and also the right of a claimant to receive benefits from the fund.

At issue in this review is the application of the criteria established by the legislature in sec. 108.02(3)(a) and (b)1 and 2, Stats., to certain individuals who are dealers or consultants for Princess House:

"(3) EMPLOYE. (a) 'Employe' means any individual who is or has been performing services for an employing unit, in an employment, whether or not the individual is paid directly by such employing unit; except as provided in par. (b) or (c).

"(b) Paragraph (a) shall not apply to an individual performing services for an employing unit if the employing unit satisfies the department as to both the following conditions:

"1. That such individual has been and will continue to be free from the employing unit's control or direction over the performance of his services both under his contract and in fact; and

"2. That such services have been performed in an independently established trade, business or profession in which the individual is customarily engaged."[2]

It is the contention of Princess House that the claimants, Princess House dealers, were not employees of

---

[1] *Princess House, Inc. v. ILHR Dept., Viola Stanford and Dianne Giebel Elmer,* 105 Wis. 2d 743, 314 N.W.2d 922 (1981). In the Supreme Court proceedings, the name of the defendant-respondent appears as Leola Stanford, rather than Viola Stanford.

[2] This provision has not been changed in any material relevant respect since January 1, 1974, the beginning of Princess House's liability for contributions according to the Department of Industry, Labor and Human Relations. Accordingly, we are using the 1979 version of sec. 108.02(3), Stats., throughout.

Princess House under sec. 108.02(3), Stats., because they performed no services for Princess House; and even if they were employees under sec. 108.02(3)(a), Princess House was exempt from making contributions, because the employees were free from the controls specified in subsec. (3)(b)1 and because any services performed were in an exempted independently established business as provided in subsec. (3)(b)2.

We have considered each of these contentions in turn; and having done so, we conclude that the decision of the court of appeals must be affirmed.

The parties on this review have extensively briefed the question of the appropriate standard of review. Because the evidentiary facts are undisputed, we ordinarily would conclude that the standard by which such facts are to be reviewed is irrelevant. The position taken by the parties is similar. However, the parties point out that this court has never addressed the standard of review subsequent to the statutory revision of 1977, which added (6) to sec. 102.23, Stats.

Sec. 108.10(4), Stats., authorizes an employer to commence an action for judicial review of a commission decision. The scope of the review is specified to be the same as that set forth in sec. 108.09(7). That latter section provides that:

"(b) Any judicial review . . . shall be confined to questions of law, and the provisions of ch. 102 with respect to judicial review of orders and awards shall likewise apply to any decision of the commission reviewed under this section. . . ."

Chapter 102 deals with worker's compensation. Sec. 102.23(6), Stats., adopted in 1977, delineates the authority of a court to review orders of the Commission. That statute provides:

"(6) If the commission's order or award depends on any fact found by the commission, the court shall not

substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact. The court may, however, set aside the commission's order or award and remand the case to the commission if the commission's order or award depends on any material and controverted finding of fact that is not supported by credible and substantial evidence."

Prior to the revision of 1977, there was no explicit statutory direction to the courts in respect to the standard to be utilized in reviewing the fact findings of the Department of Industry, Labor and Human Relations (hereinafter DILHR) in respect to awards under the Worker's Compensation Act or the Unemployment Compensation Act. The only statutory direction appeared in sec. 102.23 (1) (d), Stats. 1975, that a judgment could be set aside only on the grounds:

"1. That the commission acted without or in excess of its powers.
"2. That the order or award was procured by fraud.
"3. That the findings of fact by the commission do not support the order or award."

These generalized standards were given various interpretations by this court from the time of the enactment of the worker's compensation statute to the present. Essentially, the interpretations have had substantially the same meaning, but the language over the years has revealed a variety of nuances.

We said in *International Harvester Co. v. Industrial Comm.,* 157 Wis. 167, 147 N.W. 53 (1914), that the commission did not have the power to make a fact finding not supported by *any evidence whatever.* In *Heileman Brewing Co. v. Industrial Comm.,* 161 Wis. 46, 152 N.W. 446 (1915), we said a finding will be reversed only when there is *no evidence* to support it. In *Johnstad v. Lake Superior Terminal & Transfer R. Co.,* 165 Wis. 499, 162 N.W. 659 (1917), we said we would not upset a finding if *well supported by the evidence.* In *Kolman v. Indus-*

*trial Comm.*, 219 Wis. 139, 262 N.W. 622 (1935), we said a court could not disturb the commission's findings if supported by *competent credible evidence*. In *Sauk County v. Industrial Comm.*, 225 Wis. 179, 273 N.W. 515 (1937), findings of fact were to be upheld if sustained by *credible evidence*.

In *Jasperson v. Industrial Comm.*, 231 Wis. 142, 285 N.W. 391 (1939), we said a finding of fact must be supported by *substantial evidence*. *Brouwer Realty v. Industrial Comm.*, 266 Wis. 73, 62 N.W.2d 577 (1954), stated that a finding would be sustained if it were supported by *any credible evidence which, if unexplained, would support the finding*. In *Hill's Dry Goods Co. v. Industrial Comm.*, 217 Wis. 76, 258 N.W. 336 (1935), we held that a finding should be sustained if the basis of evidence presented, which *if unanswered*, would justify a reasonable person to affirm the existence of the fact in question.

Subsequently, *R.T. Madden, Inc. v. ILHR Dept.*, 43 Wis. 2d 528, 169 N.W.2d 73 (1969), attempted to reconcile these variously stated standards of review. In *Madden,* we said:

"It is our conclusion the test should be whether there is any credible evidence in the record sufficient to support the finding made by the department. The assumption in that test is, of course, that the evidence is relevant, that it is evidentiary in nature and not a conclusion of law, and that it is not so completely discredited by other evidence that a court could find it incredible as a matter of law. This is clearly not the same as a reviewing court's weighing conflicting credible evidence to determine what shall be believed. That is solely within the province of the administrative agency.

"It should also be noted, contrary to appellant's contention, that the duty of the applicant is not to prove his case by a preponderance of the evidence, but merely to produce such credible evidence that the findings will rest upon facts and not upon conjecture or speculation.

"...

"... If there is credible, relevant, and probative evidence and that evidence construed most favorably would justify men of ordinary reason and fairness to make that finding, the evidence is sufficient. A finding should rest upon such evidence and not upon a mere scintilla of evidence or upon conjecture and speculation." Pp. 547-48.

This decisional attempt to give some element of consistency to the standard of review was, in effect, codified in 1977, when sec. 102.23 (6), Stats., was enacted. Theretofore, the standard of review was developed by the court inferentially on the basis of the language of sec. 102.23 (1) (d). *See, Consolidated Papers, Inc. v. ILHR Dept.*, 76 Wis. 2d 210, 215, 251 N.W.2d 69 (1977).

Sec. 102.23 (6) is a totally new subsection enacted by ch. 195, Laws of Wisconsin 1977. Pertinent to this review is the language authorizing the court to set aside an award if the requisite finding of fact "is not supported by credible and substantial evidence."

Does this set a new or different standard than that explained and approved in *Madden?* We think not. The petitioner, Princess House, appears to contend that, under this standard, the court can no longer look to isolated items of evidence that will sustain a finding, but instead must look to the record as a whole. The petitioner's explanation of the present rule is that:

"... by adding the word 'substantial' to the word 'credible,' the legislature has pushed the standard of review along the continuum to the point where the court must give closer consideration to the record as a whole, and must require a substantial basis for the Commission's opinion."

We think the petitioner's contention is merely an echo of what already has been stated in *Madden, supra.* Therein, we explicitly ratified the practice of looking to the whole record to determine whether an item of evi-

dence sought to be relied upon was relevant, probative, and of a nature that it was not completely discredited as a matter of law by other uncontrovertible facts. We also stated that evidence must be of a nature, when most favorably viewed, as to justify persons of ordinary reason and fairness to reach a conclusion based upon it. We stressed the fact that mere conjecture or a mere scintilla of evidence was not enough. Evidence that is relevant, probative, and credible, and which is in a quantum that will permit a reasonable factfinder to base a conclusion upon it, is "substantial" evidence. We see no change in the standard of review in respect to worker's compensation cases or unemployment compensation cases as the result of the addition of sec. 102.23(6), Stats.[3]

The standard to be applied under sec. 102.23(6), Stats., continues to require that deference be accorded the Commission's findings of fact. A reviewing court may not substitute its own judgment in evaluating the weight or credibility of the evidence. Under the statutory restatement appearing in sec. 102.23(6), as prior thereto, if there is relevant, credible, and probative evidence upon which reasonable persons could rely to reach a conclusion, the finding must be upheld. As indicated in *Madden, supra,* the entire record can be brought before the court to determine whether or not evidence

---

[3] The concurring opinion of Justice Robert Hansen to *Madden* represented not a difference with the substance of the majority opinion, but rather posed the argument that the court ought not have limited its holding only to worker's compensation cases, that in fact the standard of review under chs. 227 and 102 were identical and we should say so. That question was, however, not an issue in *Madden,* nor is it an issue in the instant case. As in *Madden,* we make no determination here in respect to the similarity or dissimilarity of the standards for review under ch. 102, as compared to ch. 227.

sought to be relied upon is so discredited as to be discarded as a matter of law. If the evidence is not discredited and meets the other facets of the *Madden* test, the evidence is substantial. It is implicit in *Madden* that reasonable persons would not rely upon insubstantial evidence. The codification has made no change in the rule that findings may be sufficient even though they are not based upon a preponderance of the evidence.

These proceedings stem from the application of Leola Stanford for unemployment compensation. Upon the filing of her application for benefits upon her layoff from Master Lock in Milwaukee, it was revealed that she also had been a dealer selling Princess House gifts. Thereafter, an examiner, the appellate tribunal, and the Labor and Industry Review Commission determined that Princess House was an employer under the Act and was liable to make contributions to the unemployment compensation fund.

The Labor and Industry Review Commission affirmed the appeal tribunal in each respect: That the dealers or consultants (of whom Leola Stanford was one) performed services for Princess House as salespersons for a percentage of gross sales, that the consultants were not free from the direction or control of Princess House because of its sales structure, and that the consultants had no established business apart from saleswork for the company. Commissioner Ausman filed a dissenting opinion based solely upon his view that Princess House did not exercise control over the dealers and that they had independently established businesses and, therefore, they were not employees subject under the Act. He did not state any disagreement with the majority that, under sec. 108.02(3)(a), Stats., the dealers were individuals rendering services for an employing unit. He concluded, however, that these services were exempt under the Act.

Princess House brought an action in the circuit court

for Dane county to review the commission decision. That court affirmed the Commission. On appeal, the court of appeals affirmed the finding that an employment status existed under sec. 108.02(3)(a), Stats., and that, because Princess House had not established that its dealer's services were performed in an independently established trade, business, or profession, under sec. 108.02 (3)(b)2 it was not exempt from liability to pay into the fund.

The facts, which are substantially undisputed and were adduced in the administrative proceedings, are these:

Princess House, Inc., is a Massachusetts corporation which is engaged in the manufacture and sale of household products, principally glassware, plus china and metal products. Over 90 percent of Princess House's sales are made through individuals the company refers to as "dealers" or "consultants," whose status is at issue in this case.

Every dealer executes a contract with Princess House which is titled "Independent Dealer's Agreement." The contract provides that the company will sell, and the dealer will buy for resale, the company's products on certain terms and conditions. Subject to conditions beyond its control, Princess House guarantees a continuous supply of its products. The company is to provide the products at its suggested retail price, less its dealer discount. The products will be delivered, cash on delivery, to the dealers or anyone else she designates. The company retains the price charged the dealer and remits the balance to the dealer.

The contract provides that the dealer can sell to anyone, anywhere. The dealer may set the price of the Princess House products and is permitted to sell the products of any other company. Dealers are prohibited from representing themselves as agents of Princess

House. The company agrees to sell advertising material, sales aids, and order blanks, but the dealer is not required to use any of them.

Princess House states in the contract that it has no control over the dealer and agrees to exercise no control over the conduct of the dealer's business. The contract provides that the relationship between Princess House and the dealer is that of seller and purchaser of merchandise. According to the agreement, the dealer becomes the owner of the products once they are delivered. Princess House has the dealers sign a statement that they understand they are not Princess House's employees and are not covered by unemployment or worker's compensation acts.

The contract is for a ten-year term, but the dealer may extend it for another ten years by notifying Princess House in writing at least thirty days prior to the termination date. The dealer may terminate the agreement on thirty days notice to the company. Princess House may not terminate the agreement unless the dealer engages in deceptive sales practices, or has misrepresented its products, or is in violation of any state or federal statute.

There is another written agreement regarding the sale of the sample kit from Princess House to the dealer. It deals primarily with the method of payment for the kit. It states that the consultant agrees to maintain good sales activity. Title to the samples remains in Princess House until they are paid for in full. The dealers also agree to have Princess House remit any state sales taxes incurred on their orders.

Several people testified at the hearing about the relationship, in fact, between Princess House and its dealers. The company called Charles A. Collis, chairman of the board. He explained that the dealer's basic profit is a 27 percent discount off the suggested retail price of Prin-

cess House products. A dealer can recruit new dealers and become a unit organizer. The company pays unit organizers 7½ percent of the sales made by dealers in their units. Above the unit organizers are area organizers, who get payments of 16 percent of the sales made by dealers under them. Collis testified that Princess House has no control over who becomes unit and area organizers.

According to Collis, the dealer sells to her customers, fills out order forms, and tells Princess House where to ship the products. Princess House ships to the designated person and remits the profit to the dealer. The dealers send in a summary of their orders and individual order forms for each customer.

Collis said that Princess House does not control the method of selling and that consultants can, and do, charge any price they wish. Dealers may maintain an inventory. There is no mandatory sales volume, and Princess House holds no mandatory meetings. Princess House does not reimburse dealers for any expenses they incur. Dealers are permitted to sell any other products.

Princess House sells order pads, brochures, invitations, and other paper goods to dealers. The company also has special products which the dealers can buy to use as incentives to get hostesses for their sales parties. Princess House sells merchandise certificates to dealers, which they can use to offer reduced prices. The company charges 25 cents on the dollar for these certificates.

The company expects dealers to handle complaints about merchandise. It will take care of any complaints that the dealers send in.

Collis testified that the company had terminated only two dealers that he could remember. He said that one case involved considerable dishonesty and the other was for misrepresentation of a serious nature.

The company has what it calls an equity policy. In it, the company agrees to purchase the dealer's business

records upon her death or retirement. There is a sliding scale for payment depending on the amount of "personal net purchases" in the year preceding death or retirement. The dealer must have made at least $5,000 in net purchases to get the minimum payment—$100. The policy also provides that any shows which the consultant booked to be held after her retirement or death can be transferred to another consultant and the consultant or her estate will get 40 percent of the profits.

Collis testified that, in return for the equity payment, the company receives customer names and records of orders. He then sends the names out to other dealers. Collis said that the dealers' customers are valuable to the company.

Leola Stanford was called on behalf of DILHR. She said she received training on how to sell the products from her unit organizer. She was taught to use the party sales plan, though she was never told she had to sell that way. Stanford bought a sample kit, which included not only samples but also information. For example, the kit included a description of the amount of the dealer's discount. She believed she was required to buy the sample kit.

Stanford said she was a demonstrator and seller. She used only the party plan which involved getting a hostess who would invite individuals to attend a party. Then Stanford would go to the hostess' home, demonstrate the products, and take orders. She would send the orders to the company, and the company would send out the products. The products were delivered C.O.D. to the hostess. The hostess collected the payments from, and distributed the products to, the individual customers. Then Stanford would get a check from Princess House for the amount of her commission.

Stanford said she was required to make weekly reports to her unit organizer. The unit organizer held weekly

meetings. She said the organizer told her she had to attend a certain number of these meetings.

Sometimes Stanford got materials directly from Princess House about contests, ways to increase sales, and notices about new products.

Stanford kept no inventory. She had no business cards and did no advertising. She had no place of business apart from her home. She sold no other products. She was not required to work any particular hours. She paid for her own expenses, such as gas and decorations.

Princess House called several other dealers to testify. They all use the party sales plan, predominantly. Some also sell from catalogs or through the "heirloom club," through which one customer makes a series of purchases. Some of the dealers kept a small inventory of replacement parts, products which were to be discontinued, or particular items in anticipation of price increases.

Some of the dealers made other investments in addition to the sample kit. One bought a printing press (she is an area organizer), and one bought a car. The dealers had unreimbursed expenses, such as for decorations, incentive prizes, and postage. An area organizer testified that she had a separate phone listing for Princess House Gifts. Another dealer had her own business cards printed.

One dealer sells lingerie for Penny Rich Company and sells for Amway. Another had in the past sold for Amway and Avon while selling for Princess House. Several dealers testified that they sometimes charge less than the suggested retail price.

Two women testified that they sold their businesses to Princess House, one for $500 and the other for $750. Two area organizers said that they sometimes sell parties that they have booked to other dealers (who then do the demonstration) for a percentage of the profits.

Three women testified that they believed they could sell their businesses to someone else if they wanted to, but there was no evidence in respect to sales to persons outside the Princess House organization.

In applying these facts, which in all relevant respects are undisputed, to the legal question of whether Princess House should be subjected to liability under the Unemployment Compensation Act, the act itself should be put in perspective, and the underlying purpose of the act should be given paramount consideration.

The public policy which impelled the act is set forth by the legislature in sec. 108.01 (1), (2), and (3), Stats.:

"108.01. **Public policy declaration.** Without intending that this section shall supersede, alter and modify the specific provisions hereinafter contained in this chapter, the public policy of this state is declared as follows:

"(1) Unemployment in Wisconsin is recognized as an urgent public problem, gravely affecting the health, morals and welfare of the people of this state. The burdens resulting from irregular employment and reduced annual earnings fall directly on the unemployed worker and his family. The decreased and irregular purchasing power of wage earners in turn vitally affects the livelihood of farmers, merchants and manufacturers, results in a decreased demand for their products, and thus tends partially to paralyze the economic life of the entire state. In good times and in bad times unemployment is a heavy social cost, directly affecting many thousands of wage earners. Each employing unit in Wisconsin should pay at least a part of this social cost, connected with its own irregular operations, by financing compensation for its own unemployed workers. Each employer's contribution rate should vary in accordance with his own unemployment costs, as shown by experience under this chapter. Whether or not a given employing unit can provide steadier work and wages for its own employes, it can reasonably be required to build up a limited reserve for unemployment, out of which benefits shall be paid to its eligible unemployed workers, as a matter of right, based on their respective wages and lengths of service.

"(2) The economic burdens resulting from unemployment should not only be shared more fairly, but should also be decreased and prevented as far as possible. A sound system of unemployment reserves, contributions and benefits should induce and reward steady operations by each employer, since he is in a better position than any other agency to share in and to reduce the social costs of his own irregular employment. Employers and employes throughout the state should co-operate, in advisory committees under government supervision, to promote and encourage the steadiest possible employment. A more adequate system of free public employment offices should be provided, at the expense of employers, to place workers more efficiently and to shorten the periods between jobs. Education and retraining of workers during their unemployment should be encouraged. Governmental construction providing emergency relief through work and wages should be stimulated.

"(3) A gradual and constructive solution of the unemployment problem along these lines has become an imperative public need."

In *Moorman Mfg. Co. v. Industrial Comm.*, 241 Wis. 200, 204–05, 5 N.W.2d 743 (1942), this court, in commenting on this legislative declaration of policy, said:

"That purpose was to relieve 'unemployed workers' and 'wage earners.' The subsection shows that the act contemplates compensation for loss of earnings by workers. This must be given great—even controlling—effect, in determining who are employees under the act as it is the employees who are to receive the compensation provided for . . . ."

Hence, the statute is remedial in nature and should be liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status.

Employee is defined by sec. 108.02(3)(a), Stats.:

" 'Employe' means any individual who is or has been performing services for an employing unit, in an employment, whether or not the individual is paid directly by such employing unit . . . ."

This terminology, in accordance with the legislature's declaration of purposes, must be interpreted broadly to further the legislative intent. As set forth in Asia, *Employment Relation: Common-Law Concept and Legislative Definition,* 55 Yale Law Journal 76, 85 (1945) :

"The declaration emphasizes what would be evident even without it: that the statute is remedial legislation with a broad purpose to avoid economic insecurity. Thus, at whatever line the limits of the employment relationship might be drawn for various other purposes, with respect to unemployment insurance the definitions of 'employment' should be interpreted with a view toward effectuating the underlying policy of the legislation. Workers falling on either side of the line of demarcation drawn for respondeat superior purposes may be within the class exposed to the hazard against which the unemployment insurance legislation is intended to afford protection."

Princess House argues that the dealers or consultants are not employees covered by the act, because they do not perform services for Princess House—they simply buy its products—and the services of the dealer are solely for the dealer's benefit and not Princess House.

The contract and the entire course of dealing of Princess House is designed to avoid the unemployment compensation law of the state of Wisconsin and similar laws in other states in which Princess House operates. However, whether or not an individual takes title to property and then resells or whether the individual acts as a direct agent for a manufacturer is irrelevant to whether that individual performs services for the manufacturer. Whether title passes directly from Princess House to the ultimate consumer or whether it goes first to the dealer

is also inconsequential. The contract contemplates that the dealer will "resell" the product—obviously for the benefit of Princess House—or it would not have been included by Princess House in the contract it drafted and relies upon. The dealer's sales benefit Princess House as well as the dealer. These sales by dealers who are signed up by Princess House representatives are essential to the corporate life of Princess House. Without the resale function performed by dealers, the sales of Princess House would, under the present mode of operation, be reduced 90 percent. The chairman of the board acknowledged that the customers are very important to the company. Customers attain that status, the status of buyers of Princess House glassware, only because of the demonstrations by the dealers and their salesmanship. Clearly, the dealers are individuals performing services for Princess House. Service is, essentially, aiding the principal in the regular conduct of business. This was the role of the dealers in relation to Princess House.

It is obvious that the statutes establishing programs of unemployment insurance contemplate a broad definitional coverage of individuals who render service. They are those persons who are likely to be economically dependent upon others for employment.

This broad, almost presumptive, coverage, which is intended by sec. 108.02(3)(a), Stats., is, however, narrowed by the exclusions from coverage defined in the subsequent paragraphs, sec. 108.02(3)(b)1 and 2.

Willcox, *The Coverage of Unemployment Compensation Laws,* 8, Vanderbilt Law Rev. 245, 260 (1955), spoke to this problem:

"If a salesman buys goods from a manufacturer and resells them, the fact that title has passed may enable him to argue that he is selling for his own account and that his service is rendered to himself. But if the statutory scheme is to be carried out, clearly this question should be tested by clause "C" of paragraph (5) [sec.

108.02(3)(b)2 in the Wisconsin law], not by paragraph (1). Other property relationships also, such as that of lessor and lessee or bailor and bailee, may accompany the performance of service without removing the case from paragraph (1). There should be no need, as is often assumed, to find that the property aspect of the relationship is a sham or a subterfuge; for surely the newsboy, for example, is rendering service to the newspaper, in the sense in which this statute speaks of 'service,' even though he has acquired bona fide and valid legal title to the papers he sells. The test of his coverage should be found in the 'ABC' clauses, not in an attempt to pierce an ostensible transfer of title in order to bring the case within paragraph (1), where it belongs in any event."

The same analysis is appropriate in the instant case. It is apparent beyond any reasonable argument that the dealers render a service to the employing unit, Princess House. Whether Princess House is, nevertheless, exempt under the provisions of sec. 108.02(3)(b)1 and 2, Stats., is not implicated in the initial determination that the dealers render services for Princess House. The facts in this respect are undisputed, and we affirm the findings of fact of the Commission and hold, on the basis of those facts, that the Princess House dealers perform services for Princess House.

The fact that this initial statutory definition of service has been satisfied is sufficient to subject an employer to liability for paying into the unemployment compensation fund unless the employer is able to meet the positive test of sec. 108.02(3)(b)1, Stats.:

"(b) Paragraph (a) shall not apply to an individual performing services for an employing unit if the employing unit satisfies the department as to both the following conditions:

"1. That such individual has been and will continue to be free from the employing unit's control or direction over the performance of his services both under his contract and in fact . . ."

*and* the positive test of sec. 108.02(3)(b)2:

"2. That such services have been performed in an independently established trade, business or profession in which the individual is customarily engaged."

We conclude that Princess House has met its burden in respect to the first of these subsections—the one involving control—but not the second, in respect to an independently established trade or business.

The putative employer must show that his employee "has been and will continue to be free from the employing unit's control or direction over the performance of his services both under his contract and in fact."

DILHR admits that the contract establishes very little control indeed. In fact, its very tenor is the renunciation of control. The contract is terminable only by the dealer on thirty days notice. Princess House can terminate only at the end of a ten-year period, and even then a dealer appears to have an option to renew. Termination can be effected under the contract only for deceptive sales practices for misrepresentation or for violation of state or federal laws. There is no attempt at an itemization of circumstances that would or could result in termination. This very vagueness bespeaks a lack of control over the dealers by any terms of the contract.[4] It is true also that dealers are to be bound to the code of ethics of the direct-selling industry, but there is no explanation in the contract of the details of the course of conduct to be followed. We do not con-

---

[4] As will be referred to later in the opinion, Princess House's vague definition of what is misconduct warranting discharge may well be the petard upon which it may eventually be hoist. An attempt to implement a discharge on these vague grounds might not be upheld by DILHR or the courts. A firing for misconduct that cannot be legally substantiated triggers the right to claim unemployment compensation.

sider a general admonition to be "ethical" evidence of contract control.

Princess House's control in fact over dealers is also unproved. As set forth in the facts, dealers attend training sessions and pep meetings. These sessions were set up and conducted by unit or area organizers, and there is no direct evidence of Princess House involvement in these structural meetings. While reports were made in respect to sales activities and accomplishments, they were made to the unit organizers and not to the management of Princess House. Of course, all dealers under the analysis set forth above in regard to sec. 108.02(3) (a), Stats., are employees of Princess House. Hence, dealers are answerable in their reporting to unit organizers who are employees of Princess House. Nevertheless, this type of reporting appears to be substantially voluntary, and we do not deem it evidence of control in fact by Princess House.

There is ample evidence of freedom from any supervision and freedom from the usual controls. Dealers may set their own hours and can use any marketing method they may prefer. They may set their prices either higher or lower than that suggested by Princess House. They are not territorially limited and can sell other products —even those that compete with the products of Princess House. There are no quotas that dealers must meet.

We conclude that Princess House sustained its burden of showing that its dealers were free from its control in respect to the contract between them and free from control in fact. The evidence showing that Princess House is dependent upon its dealers shows that they perform services for it, but that fact is irrelevant to whether control is exercised. The finding of the Commission that the dealers or consultants such as Leola Stanford were not free of control or direction over the performance

of those services is not supported by credible and substantial evidence. The evidence in that respect is insufficiently probative for a reasonable person to conclude that control, even of a minimal nature, is exercised by virtue of the relationship between Princess House and its dealers.

Control, in the sense of control imposed by the company, can be minimal, because conformance to company policies is attained by the dealer's adherence to conduct that comports with his or her own economic interest. Company control is lacking. While we recognize the reality of control that results from the self-interest of the dealer—and it is this type of control which the court of appeals relied upon—we do not consider that factor the "employing unit's control or direction." It is not control by Princess House.

There is, however, credible and substantial evidence in the record which supports the commission finding that the company consultants or dealers in Wisconsin did not perform services in an independently established trade, business, or profession in which the individual is customarily engaged. Hence, although we conclude, under the evidence of record, Princess House demonstrated a lack of control over the consultants under (b)1, evidence was not produced to satisfy (b)2. Accordingly, because the dealers or consultants perform services for Princess House, they are employees covered by the Act and their employer is liable for contributions to the fund.

For an interpretation of this portion of the statute, we must again return to the consideration of the policy declared by the legislature when it enacted the Unemployment Compensation Act. That declaration provides among other general statements consistent with the overall purpose of the law:

"108.01 **Public policy declaration.** . . . the public policy of this state is declared as follows:

"(1) . . . Each employing unit in Wisconsin should pay at least a part of this social cost, connected with its own irregular operations, by financing compensation for its own unemployed workers. Each employer's contribution rate should vary in accordance with his own unemployment costs, as shown by experience under this chapter. Whether or not a given employing unit can provide steadier work and wages for its own employes, it can reasonably be required to build up a limited reserve for unemployment, out of which benefits shall be paid to its eligible unemployed workers, as a matter of right, based on their respective wages and lengths of service."

The purpose of the Unemployment Compensation Act is to avoid the risk or hazards that will befall those who, because of employment, are dependent upon others for their livelihood. Sec. 108.02 (3) (b) 2, Stats., is designed to exclude from coverage those persons who are unlikely to be dependent upon others, even though they may perform services for others, because they have their own separately established business.

As Willcox, *supra,* states in his article, page 245:

"The boundary of coverage marked by the word 'employment' in the federal law and by analogous provisions of state laws corresponds . . . to the boundary of the risk against which unemployment compensation affords protection. For the man who works for himself, unlike the man who works for another, is not exposed to the risk of unemployment in the ordinary sense of the term. The hazards faced by the entrepreneur are typically of a quite different kind from those faced by the employee, and are not such as unemployment compensation is designed to meet."

The test of (b) 2 is the exclusion that applies to persons who work in their own business. Willcox, page 264,

discusses the exclusion or exception granted by that portion of unemployment compensation statutes:

". . . it requires not only that the worker be himself an entrepreneur, but also that the service be rendered by him in that capacity; and it thus approaches, as nearly as a formal test can approach, the economic line that bounds the risk of unemployment. The double requirement, that the worker's occupation be 'independently established' and that he be 'customarily' engaged in it, clearly calls for an enterprise created and existing separate and apart from the relationship with the particular employer, an enterprise that will survive the termination of that relationship. At this point some courts have tended to apply a rather mechanical test, and to find the requirement met merely because a salesman, for example, occasionally handles other products as well as those of the employer, or even because he is not forbidden to do so. It would seem that something more than this is necessary to constitute that holding out to the public (or to a class of customers of his own selection) which is ordinarily a characteristic of the entrepreneur; and also, that some examination of the origin of the worker's enterprise, beyond the fact that it is not created exclusively by the employer, is called for by the word 'customarily.' "

Thus, on the face of the Wisconsin statute appears the requirement, if the exception is to be applicable, that the work of the individual rendering service be "independently established" and also that it be one in which the individual is "customarily engaged."

This is a legislative statement in respect to a class of persons who are not dependent on another employing unit. The test is not a mechanistic one. It serves a purpose that is consistent with the general policy of the unemployment compensation law. Because persons of the class envisaged in the exception are not dependent on an employer, the risk of their unemployment must be borne by themselves and not another. This class of persons cannot have its employment terminated at the will of an

employing unit. Persons who pursue an established business of their own are not usually dependent on another for their economic survival.

Asia, *supra,* pages 87–8, points out the two-pronged requirement of statutory provisions like (b) 2. He states:

"Under the statutory definition the words 'independently established' depart from the technical 'independence' of the common-law independent contractor and seem to require that the individual performing services be engaged in a trade, occupation, profession, or business which is established independently of the particular connection he may have from time to time with certain principals. The words *'customarily* engaged' would seem to require that he customarily hold himself in readiness to render services in the course of such trade, occupation, profession, or business to individuals desiring to engage him, and would appear not to be satisfied where the trade, occupation, profession, or business exists only in a particular relationship with a principal and would vanish when that connection terminates.

"The 'C' [sec. 108.02 (3) (b) 2 in the Wisconsin law] test, in summary, seems to draw the line of demarcation on an economic basis, so as to include within the Act those who perform services for an entrepreneur and who are not themselves acting as entrepreneurs in that connection in the pursuit of an independently established business, trade, or profession. Moreover, being essentially a test of economic status and existing independently of the 'A' test relating to control, the 'C' test precludes the 'manipulation' of the employment relationship which the control test makes possible for employers, who may so draw the contract of employment and so arrange their methods of supervision that an appearance of freedom from control is created."

The meaning of this exception was recognized in Wisconsin law in *Moorman Mfg. Co. v. Industrial Comm.,* 241 Wis. 200, 5 N.W.2d 743 (1942). *Moorman* involved an individual who sold stock food on a commission basis under a contract which denominated him an independent contractor. After first determining that the common-

law status of independent contractor[5] did not preclude Moorman's status as an employee under the Wisconsin act, the court turned its attention to the exception from coverage for one who was customarily engaged in an independently established business. Justice Fowler, speaking for the court, said:

"It seems quite clear that the instant claimant was not 'customarily engaged in an independent trade or business.' This clause contemplates the case of a tinsmith by trade whom the company might call in to repair the gutters on one of its buildings, or a painter it might call to paint it, and like cases. The commission therefore could not be satisfied—and they were not satisfied—that Elliott was customarily engaged in an independent trade or business . . . ." P. 206.

Thus, Justice Fowler recognized the true meaning of the (b)2 exclusion clause: One is not at economic risk of unemployment by the conduct of another when he is the proprietor of a business that has been established independently of any relationship by which services are performed for another, and which business constitutes a means of livelihood that is customary and apart from the livelihood gained when services are performed for a particular person or unit.

A review of the facts here reveals beyond doubt that the dealers rendering service to Princess House cannot meet this test.

---

[5] The petitioner places heavy reliance upon *Aparacor, Inc. v. United States* (U.S. Ct. of Claims 1977), 556 Fed. 2d 1004. *Aparacor* is irrelevant, for the definitions therein rely upon the common law. *Moorman, supra,* makes clear that the Wisconsin unemployment compensation law supercedes the common law. The federal compensation law has been specifically interpreted by congress to preserve the common law shibboleths in respect to master-servant relationships. For an interesting discussion of this phase of federal law, see Willcox, *supra,* pages 251 ff., especially p. 253. *Aparacor* is a common-law case and, accordingly, must be excluded from the jurisprudence of the Wisconsin Unemployment Compensation Act.

Their business was not independently established. It was established by virtue of a contract drawn up by Princess House. The business of the dealer is dependent upon the relationship with Princess House and cannot survive the termination of that contractual relationship. If that relationship is severed, the economic risk that unemployment compensation seeks to insure against ensues. These dealers do not have a separate business that can survive and assure them a livelihood. Their situation is poles apart from that contemplated by the statute and which is made explicit by Justice Fowler's language. When services rendered by a tinsmith to one who hires him are completed, his business, which has been established without regard to the person who from time to time utilizes his service nevertheless goes on. He performs service for others in the trade in which he is customarily engaged. The termination of these services in the due course of trade, the completion of a job, does not expose the tinsmith to the risk of unemployment in the sense that the usual employee is exposed to that risk.

The public purpose of the law as declared by the legislature is furthered by the interpretation placed upon the clause by Justice Fowler. It is noteworthy that, in reaching his interpretation in *Moorman,* he specifically relied upon the public-policy declarations of the legislature. *See, Moorman, supra,* p. 206 n. 1.

We are referred to another test, the "proprietary interest" test, which this court utilized for the first time in *Transport Oil, Inc. v. Cummings,* 54 Wis. 2d 256, 195 N.W.2d 649 (1972). Although that test of (b)2 is not found in the statutes, this court accepted it as one reasonable interpretation of the requirements of the exception clause by the agency charged with the administration of the law. In utilizing the test, we recited the language of the appeal tribunal:

" '. . . for an individual to be customarily engaged in an independently established trade, business or profes-

sion, it must be such a business as the person has a proprietary interest in, an interest which he alone controls and is able to sell or give away.'" P. 266.

The proprietary-interest test in *Transport Oil* was insufficient to provide an exception because the provisions of the lease in that case did not support the conclusion that the individual involved had a proprietary interest which could survive absent the lease arrangement. It was, rather, apparent that, upon the termination of the lease, the station operator had no business whatsoever. His business was not an independent one. It was totally dependent upon his relationship with the oil distributor. The judgment was reversed for other reasons.

In *Sears, Roebuck & Co. v. ILHR Dept.*, 90 Wis. 2d 736, 280 N.W.2d 240 (1979), we again utilized the proprietary-interest test. It was argued that the Sears contract fulfilled the conditions for exception under that test because the business could be assigned or transferred. This court stated:

"The fact remains, however, that Sears has a right to veto the transfer. Although Sears may not unreasonably withhold its consent, the contractual language hardly fulfills the requirement that the business be one that 'the person has a proprietary interest in, an interest where he *alone* controls and is able to sell or give away.'" P. 751.

The court concluded that the test of sec. 108.02(3)(b)2, Stats., had not been satisfied.

The teaching of *Transport Oil* and *Sears* is that, for the proprietary-interest test to apply, the business must be one of value which the individual *alone* can sell or give away.

Neither the test of an independently established business in which an individual is customarily engaged nor the proprietary-interest test is met in this case.

In this case, Princess House points to the fact that the dealers have an entrepreneurial interest in their dealerships. They purchase a sample kit, order forms, invitations, and gifts. They manage their own inventory, and they can advertise or not at their own option. They pay their own taxes and bear the risk of loss. It is also contended that they develop the asset of good will which is reflected in the customer lists, which are developed over a course of dealing.

While these facts show that how the dealers operate is optional with them, and hence they are substantially free of control, those facts are irrelevant to the test of whether a business can be sustained absent the relationship with Princess House. The assets they have accumulated, if they be such, are only disposable by sale or transfer to another dealer or consultant who has a contract with Princess House. Thus, there is no option to dispose of the business, if it be such, at the dealer's volition alone. The option is limited to a disposition to a class of persons under contract to Princess House. Nothing of value except the assets of a dissolved enterprise remain absent the relationship with prospective buyers, which relationship is created at the option of Princess House. While some of the dealers testified that they could sell to anyone, this conclusionary evidence is incredible as a matter of law. All that could be sold is the bare assets. To sell the dealership, the cooperation and assent of Princess House must be given, *i.e.*, the sale must be to a dealer under contract with Princess House. Without that assent, that which is acquired is not a Princess House dealership—nothing of value in a going concern can be transferred.

Insofar as a dealer who wishes to sell is concerned, the most that could be sold is a business that was established only through a contractual relationship with Princess House. It is not a business that was separately or

independently established. Nor is it a business in which the dealer is customarily engaged apart from the relationship with Princess House.

It is also argued that the Princess House "equity" program demonstrates a proprietary interest. While Princess House has made payments for terminated dealerships, it has done so on the basis of past sales volume. This may well demonstrate that the value of these dealerships is, as the Court of Appeals stated, really in the nature of a retroactive bonus or compensation. If that is not true, then Princess House perhaps proves too much —that the dealerships are indeed integral to the overall operation. The payment evidences the past performance of services to Princess House. This is the principal indicia of the employment relationship under sec. 108.02 (3) (a), Stats.

More importantly, the sale is not made on the open market. The equity sale must be made to or through Princess House. This is not a business which can be sold or given away to any willing buyer. The sale or purchase agreement, if it be that, can only be to the employer, Princess House. Also, it should be noted that most of what Princess House acquires, *i.e.*, alleged good will, hostess, and customer lists, the company already has, because this information is supplied to the company as orders are shipped. Princess House has not by credible and sufficient evidence demonstrated that a dealer's "business" is freely assignable. In any event, insofar as the dealer is concerned, the individual sought to be protected is separated from his relationship with Princess House, he loses his source of income, and he becomes a person of the class sought to be protected by the unemployment compensation legislation. The business ceases to exist. There is no separately established business, in which the individual is customarily engaged, that continues.

The final argument of Princess House is that its dealers can never be eligible for unemployment compensation benefits. This is not true. The department or the courts may determine that a termination which has been labelled as being for misconduct is not misconduct within the meaning of sec. 108.04(5), Stats. As the reported cases show, this is not an unusual event. Princess House could go out of business, and unemployment compensation payments would be due. It could terminate a contract in violation of the contract, and benefits would be payable.

The fundamental question, however, as the Oregon Court of Appeals well stated in *Revlon Services, Inc. v. Employment Division,* 30 Or. App. 729, 735, 567 Pac. 2d 1072 (1977):

". . . is whether the person performing the services is an entrepreneurial enterprise enjoying such a degree of economic independence that the enterprise can survive any relationship with the particular person contracting for the services."

It is clear in this case, under the facts, that, when the relationship with Princess House is terminated, the particular enterprise is at an end. Princess House dealers are employees under the Act, and accordingly Princess House is obligated to pay into the fund.

The findings of fact upon which the order of the Commission is based, with the exception of the finding in respect to sec. 108.02(3)(b)1, Stats. (control), are supported by credible and sufficient evidence. Because the Princess House dealers were properly found to perform services for Princess House, and because the services were not shown to be performed in an independently established business in which the dealer is customarily engaged, we affirm the decision of the court of appeals.

*By the Court.*—Decision affirmed.

STEINMETZ, J. *(concurring.)* I agree with the majority that the employer, Princess House, Inc., did not meet its burden of showing that it should be entitled to an exception from unemployment compensation payments. It failed to establish that its dealers were "an independently established trade, business or profession." Sec. 108.02(3) (b)2, Stats.

The majority holds that the addition of the words "and substantial evidence" to the statute in 1977 (ch. 195, Laws of 1977, sec. 102.23(6), Stats.) did not change the quantum of evidence in a record necessary to sustain the commission's finding as that rule was established by this court in *R.T. Madden, Inc. v. ILHR Dept.*, 43 Wis. 2d 528, 169 N.W.2d 73 (1969). I disagree.

In *Madden,* we stated:

"It is our conclusion the test should be whether there is *any* credible evidence in the record sufficient to support the finding made by the department. . . .

"It should also be noted, contrary to appellant's contention, that the duty of the applicant is not to prove his case by a preponderance of the evidence, but merely to produce such credible evidence that the findings will rest upon facts and not upon conjecture or speculation. . . .

". . . .

". . . If there is credible, relevant, and probative evidence and that evidence construed most favorably would justify men of ordinary reason and fairness to make that finding, the evidence is sufficient. A finding should rest upon such evidence and not upon a mere scintilla of evidence or upon conjecture and speculation." (Emphasis added.) *Id.* at 547–48.

That holding required only *any* credible evidence or probative evidence justifying people of ordinary reason and fairness to make a finding or some evidence more than a mere scintilla of evidence or conjecture and speculation. None of those analyses approach the notion of credible "and substantial evidence." The *Madden* analysis when equated to the present statute ignores the

words "substantial evidence" and makes the term surplusage.

It does not matter whether the court looks at the record of the administrative agency as isolated items of evidence or at the record as a whole to determine whether a finding is sustainable. In either application, the evidence must be credible *and* substantial to sustain a finding.

The language of the majority opinion which in the main ignores the word "substantial" in the statute is as follows: "Evidence that is relevant, probative, and credible, and which is in a quantum that will permit a reasonable factfinder to base a conclusion upon it, is 'substantial' evidence." *Supra* at 54. I say that is not correct and is misleading.

The words relevant, probative and credible are not synonymous with substantial, nor is a degree or quantum of such evidence necessarily substantial, if a reasonable factfinder bases a conclusion on it. That only means it was convincing; however, the statute since 1977 required it to be substantial in an amount to be convincing and sustainable.

We must review findings based on whether the evidence was substantial and entitled to be convincing to reasonable minds. Sufficient evidence convincing reasonable minds is not the same as substantial evidence convincing reasonable minds.

"Substantial" by relevant definition of Webster's Third New International Dictionary (1967) is:

"2c: considerable in amount, value, or worth . . . 3b: having a solid or firm foundation: soundly based: carrying weight (a [substantial] argument) ([substantial] evidence) 4a: being that specified to a large degree or in the main . . . b: of or relating to the main part of something *syn.* see massive."

Thus defined substantial evidence is greater in amount than merely being more than a scintilla or conjecture or speculation. It is convincing because it is substantial.

It is significant the majority opinion on several occasions uses language such as "by credible *or* substantial evidence," "credible *and* substantial evidence." (Emphasis added.) Therefore, even by the majority's own application, the evidence to sustain a finding must, in addition to being credible, be substantial and that differs from the *Madden* rule.

For the reasons stated I concur in the majority's decision but disagree with some of the reasoning.