HAGEDORN, J. (dissenting).
¶40 Like a master chef, the majority slices and dices Wise's lengthy medical history, carefully working through the highs and lows to paint a picture of her evolving maladies. The majority cross-examines the doctor-written expert reports upon which the Commission relies-particularly that of Dr. Alvin Krug-and concludes that their reasoning is unsound. The upshot is that the majority believes Krug's medical analysis is not up to snuff. Had a careful analysis like the majority's been done, no reasonable medical doctor would have concluded as Krug did. And so, the Commission's similarly misguided reliance on this opinion is enough to overturn its decision.
¶41 But our review is not a Gordon Ramsay-like interrogation of an aspiring culinary artist's latest dish. Rather, we are obligated to uphold the Commission's decision to rely on some evidence-and reject other evidence-so long as what the Commission relies on is relevant, probative, and credible, and of the kind a reasonable person could rely on. See Princess House, Inc. v. DILHR , 111 Wis. 2d 46, 54, 330 N.W.2d 169 (1983). The majority's dissection of Krug's expert opinion may very well be fair when exposed to surgical lighting. But this court routinely upholds evidentiary decisions, jury verdicts, and fact finder reliance on one expert over another when we find them wrongheaded, or even logically unsound. Judicial review of worker's compensation claims is generally not designed to lead to a twenty-two page, point-by-point analysis of the merits and demerits of the various medical expert reports; doing so here invites more of these types of arguments. The circuit court got it exactly right. While a fresh review of the evidence would probably lead me to a different result than the one reached by the Commission, Krug's report is relevant, probative, and sufficiently credible, and the fact finder's decision to credit his report over others is reasonable.
¶42 The question in this case is not whether Wise's fall caused her ongoing discomfort and pain. Everyone agrees it did. Everyone also agrees that Wise had an underlying condition-avascular necrosis-that was the real cause for her later hip replacements. The question before the Commission was whether the February 17, 2013 fall "precipitated, aggravated, or accelerated" her "pre-existing avascular necrosis condition beyond its normal progression resulting in the need for hip replacement surgeries."
¶43 In a lengthy and detailed analysis, the Commission recited the plentiful evidence on that question, including the opinions of two doctors on each side of the debate. In support of its conclusion, the Commission pointed in particular to the following evidence:
• On the night of the accident, Wise noted only "a little" pain and said she would be able to work her shift that night.
• Wise told a doctor on February 23, 2013, that she was okay in the three days following the fall.
• Wise told the personnel during her emergency room visit on March 4, 2013, that her pain had been getting better.
• "Dr. Kleist reported that a CT scan done in July 2012 before the slip-and-fall at work already showed the early stages of avascular necrosis, while the MRI done shortly after the slip-and-fall did not show any fracture or compression of the femoral heads."
Considering all the evidence, the Commission determined that Krug's testimony was the "most credible, and that [Wise's] worsening symptoms after March 4, 2014 [sic] were due to the underlying condition not the effect of the slip-and-fall."
¶44 Krug's opinion was not without foundation. Krug examined Wise in August 2014 after the hip replacement surgeries had been done. In his report, he agreed with another doctor-Dr. Kenneth Kleist-that Wise's fall did not cause the avascular necrosis. Notably, Krug pointed to the fact that the injury/fall "is not associated with development of avascular necrosis," that the MRI reflecting changes in the health of her hips did not line up with the timing of her injury, and that avascular necrosis existed prior to the fall. Krug stated that the hip replacements were instead caused by "the loss of the structural integrity of her hips" as exhibited by the collapse of her femoral heads, which was also "not related to her fall." Krug opined that the femoral head collapse was caused by the avascular necrosis, and it did not show up until months after the fall. Krug also noted discrepancies in the timing and nature of Wise's reported hip pain. He concluded that the best reading of these facts is that she suffered a temporary strain that had "likely resolved by 3/4/13," and that the ongoing pain was due to her preexisting avascular necrosis.
¶45 The majority complains that this is not a very good medical analysis. It is just assuring, we are told, that crucial findings be "supported by credible and substantial evidence" consistent with WIS. STAT. § 102.23(6). It seems to me, however, that the majority is violating the first sentence of that same statute: "the court shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact." See id. The Commission found the opinion by Krug to be consistent with the other evidence and a better explanation for the hip replacement surgeries. It is for the Commission, not us, to wade through the virtues of the various expert opinions in this case. Krug's opinion may have flaws-and the majority endeavors to highlight them all-but we are not medical doctors who understand the ins and outs of avascular necrosis. Krug is. And I do not believe his opinion regarding how a single fall affected preexisting avascular necrosis is beyond the pale or inherently illogical. Fact finders can, and often do, rely on weak and flawed evidence. To me, the majority's approach is an impermissible credibility determination by another name.
¶46 Because the Commission's factual findings were "supported by credible and substantial evidence," the law requires that we affirm. See id. I respectfully dissent.