Patricia K. BERNHARDT and Candace A. Seib,
Plaintiffs-Appellants,†

v.

LABOR & INDUSTRY REVIEW COMMISSION and Briggs &
Stratton Corporation, Defendants-Respondents.

Court of Appeals

*No. 95–3549. Submitted on briefs September 16,
1996.—Decided November 13, 1996.*

(Also reported in 558 N.W.2d 874.)

†Petition to review denied.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Marianne Goldstein Robbins* and *Frederick C. Miner* of *Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.* of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *David B. Nance* for the Labor and Industry Review Commission and *Kevin J. Kinney and Gregory L. Peters* of *Krukowski & Costello, S.C.* of Milwaukee.

Before Anderson, P.J., Nettesheim and Snyder, JJ.

ANDERSON, P.J. Patricia K. Bernhardt and Candace A. Seib (Appellants) appeal from a judgment affirming the decision of the Labor and Industry Review Commission (LIRC), which held that Appellants were ineligible for unemployment compensation benefits. LIRC concluded that Appellants were suspended for good cause and were terminated by Briggs & Stratton Corporation for misconduct. Appellants contend that LIRC's finding that they participated in a "slowdown" contrary to specific language in the union contract is not supported by credible and substantial evidence. Appellants also liken National Labor Relations Board (NLRB) law with Wisconsin's unemployment compensation law, arguing that LIRC erroneously equated the union's "work to rule" campaign with an unlawful "slowdown." We conclude that there is substantial evidence to support LIRC's findings. We further conclude that NLRB law does not constitute persuasive authority within Wisconsin's employment compensation law and is inapplicable in this unemployment compensation misconduct case. Accordingly, we affirm the decision of the trial court.

Appellants worked in the large engine division (LED) at Briggs & Stratton. Seib was employed from 1972, most recently as a permanent floater, until her suspension on October 7, 1993. Bernhardt was

employed from 1973, most recently on the piston table, until her suspension on October 7, 1993. Appellants were suspended and eventually discharged for their participation in a production "slowdown" in the LED. Following their suspension, Appellants applied to the Department of Industry, Labor and Human Relations (DILHR), unemployment compensation division, for unemployment compensation benefits. DILHR denied Bernhardt's claim on October 21, 1993. Then on October 27, DILHR determined that Seib was entitled to benefits for her suspension. Briggs & Stratton appealed DILHR's decision regarding Seib and Bernhardt appealed her denial as well.

On November 5, 1993, Briggs & Stratton terminated Appellants. Appellants then refiled for unemployment compensation benefits. DILHR determined that Appellants were terminated for misconduct pursuant to § 108.04(5), STATS., 1993-94.[1] The appeal tribunal for DILHR, administrative law judge Stephen Koenig (ALJ), consolidated Appellants' appeals.[2] Hearings were held on December 16 and 17, 1993, and January 4, 1994. On January 14, 1994, the ALJ determined that Seib was not suspended for good cause or terminated for misconduct. The ALJ issued a third decision that Bernhardt was suspended for good cause, but she was not terminated for misconduct.

---

[1] Section 108.04(5), STATS., was amended by 1995 Wis. Act 448 § 70. These changes do not affect our analysis. All statutory references are to the 1993-94 statutes.

[2] Briggs & Stratton also suspended and discharged Laura Drake, a union representative, for her participation in the "slowdown." Drake's appeal was also consolidated with Seib and Bernhardt's appeal. The ALJ later determined that Drake did not engage in misconduct and Briggs & Stratton has not sought review of this determination.

Briggs & Stratton appealed these decisions and Bernhardt cross-appealed the determination that she was suspended for good cause.

On January 13, 1995, LIRC reversed the ALJ's three determinations and found that Seib was suspended for good cause and was terminated for misconduct, and Bernhardt was also terminated for misconduct. Appellants sought judicial review of LIRC's decisions. The appeals were consolidated before the circuit court for Waukesha County. On October 23, 1995, the trial court affirmed all three decisions. Appellants appeal. Additional facts will be included within the body of the decision as they apply to the issues.

Appellants first contend that LIRC's finding that there was a "slowdown" in which both Bernhardt and Seib participated is unsupported by any credible evidence in the record. On appeal, this court reviews the decisions of the administrative agency, not that of the trial court. *Wisconsin Pub. Serv. Corp. v. Public Serv. Comm'n*, 156 Wis. 2d 611, 616, 457 N.W.2d 502, 504 (Ct. App. 1990). We must affirm LIRC's findings if they are supported by any credible and substantial evidence in the record. *L & H Wrecking Co. v. LIRC*, 114 Wis. 2d 504, 508, 339 N.W.2d 344, 346 (Ct. App. 1983); *see also* § 102.23(6), STATS. Substantial evidence is less of a burden than preponderance of the evidence in that any reasonable view of the evidence is sufficient. *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 52-53, 330 N.W.2d 169, 172-73 (1983). We cannot substitute our judgment for that of LIRC in respect to the credibility of a witness or the weight to be accorded to the evidence supporting any finding of fact. *West Bend Co. v. LIRC*, 149 Wis. 2d 110, 118, 438 N.W.2d

823, 827 (1989); *see also* § 102.23(6). Where one or more inference may be drawn from the evidence, the drawing of one such permissible inference by LIRC is an act of fact finding, and the inference so derived is conclusive on the reviewing court. *Universal Foundry Co. v. DILHR*, 86 Wis. 2d 582, 589, 273 N.W.2d 324, 327 (1979).

Based on the records and evidence in this case, and after consultation with the ALJ, LIRC made the following factual findings which are relevant to this issue. In 1990, Briggs & Stratton decided to reorganize the LED with a completion date of September 27, 1993. In letters dated August 19 and August 23, 1993, Briggs & Stratton notified the union and the workers that the reorganization would occur on September 27. Subsequently, Briggs & Stratton met with the union regarding the reorganization and its affect on employees' seniority rights.

Under the contract between Briggs & Stratton and the union, LIRC considered the reorganization plan to be "grievable." The contract also agreed that "the union would not participate in or recognize any sympathy strike, nor would it authorize, approve or participate in any concerted slowdown, strike, work stoppage or other concerted interruptions of company operations . . . ."

After work on August 30, 1993, a union meeting was held to address the reorganization of the LED. During the meeting, union representatives, including Laura Drake, suggested that the workers consider actions they could take against Briggs & Stratton to express their displeasure with the reorganization. Someone suggested a production "slowdown," to which Drake responded that this was "being creative." At a follow-up meeting on September 9, 1993, the union representatives indicated that the work "slowdown"

would be deemed a "work to rule" campaign, which included a boycott of voluntary Saturday hours. After the August 30 and September 9 meetings, production in the LED dramatically decreased. On September 23, 1993, the union held a meeting at which time Drake recommended that workers return to normal production, after which production in the LED dramatically increased.

Appellants contend that LIRC made an unsubstantiated determination that there was an illegal "slowdown" in the LED where Appellants worked. Instead, Appellants assert that Drake only encouraged employees to be "creative" in their response to Briggs & Stratton's reorganization and that the union adopted a "work to rule" campaign in compliance with the contract.

We disagree. The evidence at the hearing established that the LED orchestrated a slowdown in production between August 30 and September 23, 1993. According to testimony from Greg Socks, vice president-general manager of the LED, the total production shortfall, less any downtime due to mechanical failures, between September 4 and October 16 was in excess of 53,000 engines, which represents approximately four million dollars in lost gross profit. On August 30, the red line, which Seib worked on, produced approximately 1350 engines compared to 944 on August 31, 1993. According to Socks, the production in the LED increased "maybe not to normal," but there was a "remarkable jump" after the September 23 union meeting. For example, the red line produced 1258 engines with three periods of downtime on September 23, compared to 1415 engines with four periods of downtime on September 24. In October and November,

the LED exceeded Briggs & Stratton's production plan by 5437 and 3496 engines, respectively.

In addition, Lillian Pollich, a LED worker, testified that at the August 30 union meeting Drake stated:

> [The workers] should be united in our attempt to—or demonstration and everybody should take part, and nobody—there should not be any complete stoppage at any one point on the line because that would be in violation of the contract, and everybody should be working, but at a study [sic] pace and slower—you know, at a less pace than normal production would be.

Pollich also testified that at the September 9 meeting, union representatives commended the workers' "solidarity and the unity of the demonstration" and reminded the workers that "we are not slowing down, we're 'working to rule,' and not to use the phrase 'slowdown' in the plant . . . [because] 'slowdown' . . . would be in violation of the contract because we have a no-strike, no-slowdown clause in our contract."

Appellants maintain that the evidence establishes the "work to rule" campaign, rather than a production "slowdown." Appellants further argue that "[t]he protest activities that are established in the record—working to rule and refusing overtime—are statutorily protected activities." Appellants have a mistaken view of our role on review, as well as the controlling law in an unemployment compensation case.

Initially we note that where one or more inference may be drawn from the evidence, the drawing of one such permissible inference by LIRC is an act of

factfinding and is conclusive on the reviewing court. Accordingly, we conclude that LIRC's finding that there was a "slowdown" in which Appellants participated is supported by substantial and credible evidence in the record.

Moreover, Appellants have erroneously equated NLRB law with Wisconsin unemployment compensation law. Our supreme court has already rejected the argument that Wisconsin courts should look to other jurisdictions', federal or other state courts, interpretations of unemployment compensation acts to interpret Wisconsin's unemployment compensation act. *See Moorman Mfg. Co. v. Industrial Comm'n,* 241 Wis. 200, 207, 5 N.W.2d 743, 746 (1942). The court stated that Wisconsin's, not other states', legislative policy should determine obligations under the Wisconsin act. *See id.* We are bound by the decisions of our supreme court. *State v. Clark,* 179 Wis. 2d 484, 493, 507 N.W.2d 172, 175 (Ct. App. 1993). Accordingly, we need not look to the decisions of other jurisdictions (or the National Labor Relations Board) in construing our own unemployment compensation act. *See Moorman,* 241 Wis. at 207, 5 N.W.2d at 746; *see also Star Line Trucking Corp. v. DILHR,* 109 Wis. 2d 266, 283 n.1, 325 N.W.2d 872, 880 (1982) (Abrahamson, J., concurring in part and dissenting in part); *Princess House,* 111 Wis. 2d at 72 n.5, 330 N.W.2d at 182.

**[8–10]**

Appellants also argue that there is no credible evidence to support LIRC's decision that their individual conduct constituted misconduct within the meaning of § 108.04(5), STATS. LIRC's determination of whether an employee engaged in misconduct under

108.04(5) is a legal conclusion, which we review de novo. *See Charette v. LIRC*, 196 Wis. 2d 956, 959, 540 N.W.2d 239, 241 (Ct. App. 1995). Even though this is a question of law, Wisconsin courts may assign "great weight" to the agency's determination if the administrative agency's experience, technical competence and specialized knowledge aid the agency in its interpretation and application of the law. *Sauk County v. WERC*, 165 Wis. 2d 406, 413, 477 N.W.2d 267, 270 (1991). "Great weight" is also applied where a "legal question is intertwined with factual determinations or with value or policy determinations . . . ." *Id.* (quoted source omitted). This court has determined that the question of whether certain conduct constitutes misconduct is intertwined with factual and value determinations, and therefore "great weight" should be assigned to LIRC's decision. *Charette*, 196 Wis. 2d at 960, 540 N.W.2d at 241.

Employees who are guilty of misconduct forfeit their rights to unqualified unemployment compensation benefits. Section 108.04(5), STATS. Misconduct is the intentional and substantial disregard of an employer's interests. *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 259-60, 296 N.W. 636, 640 (1941). The crucial question is the employee's intent or attitude which attended the conduct alleged to be misconduct. *Cheese v. Industrial Comm'n*, 21 Wis. 2d 8, 14, 123 N.W.2d 553, 556 (1963). Questions concerning the employee's conduct and intent are questions of fact for LIRC to determine. *Holy Name Sch. v. DILHR*, 109 Wis. 2d 381, 386, 326 N.W.2d 121, 124 (Ct. App. 1982).

Based on the records and evidence in this case, and after consultation with the ALJ, LIRC made the

following factual findings which are relevant to this issue. In regard to Seib, LIRC noted that:

> During the first week of September, a co-worker, Ms. Pollich, working in close proximity to [Seib] asked [Seib] to move faster. [Seib] responded that she was doing the best she could. Ms. Pollich, again asked [Seib] to move faster to which [Seib] replied 'I'll go back to work when Laura tells me to'. Another co-worker, Ms. Mendini, also heard [Seib] indicate that she would not work until Laura [Drake] said to. Ms. Mendini also noted that at times motors were backed up where [Seib] was working. A third co-worker, Ms. Wilson, noted that after August 30, wherever [Seib] was working, the line was backed up behind her. A fourth co-worker, Ms. Dunton, observed [Seib] reading, writing letters or simply doing nothing at all during the period of August 31 to September 23.

On October 7, 1993, Briggs & Stratton's director of employee and industrial relations met with Seib to discuss reports from workers that she was not performing her work duties. During the meeting, Seib claimed that she was unaware of a production decrease or that other workers were slowing down. She said that she did not know what "work to rule" meant and if she slowed down the line she claimed it was because of her sore wrist. Seib was suspended on that date and eventually terminated for participation in the work "slowdown."

Regarding Bernhardt, the evidence revealed that she had written the following note:

> Sharon—Just a note to tell you that you guys on 2nd shift are producing way too much—line 7 too—1st shift is slowed down—it will only work if you guys

do too! No matter what Stan promises! So start spreading the word—we're all in this together!! Have a nice weekend—Don't work too hard. Me.

Although Bernhardt initially denied writing the note, on October 7, 1993, management met with her, and Bernhardt admitted that she had written it. When asked why she had written the note, Bernhardt indicated it was because second shift was producing too much. Bernhardt then requested the presence of Drake. After consulting with Drake, Bernhardt claimed to have written the note over concerns with the nicking of pistons which had never been reported to management. Then Bernhardt stated that the note related to concerns over protecting her line's rate. At that point, Bernhardt was suspended and subsequently discharged on November 5, 1993, for participating in a "slowdown" in violation of the written agreement between Briggs & Stratton and the union.

LIRC concluded as a matter of law that Appellants intended to conduct a slowdown, thereby acting in an intentional, wilful or substantial disregard of Briggs & Stratton's interests. Specifically, LIRC stated:

> [Seib] was discharged for misconduct connected with her work. The statements made to co-workers and [Seib's] lack of work activity during the slowdown period demonstrated an intentional withholding of effort on the part of [Seib]. [Seib's] inaction went beyond merely working to the confines of the union contract and constituted a work slowdown by [Seib]. While [Seib] maintained that her lack of production related to a sore wrist, the commission does not credit such explanation given [Seib's] comments to her co-workers.

. . . .

The commission did consult with the administrative law judge regarding witness credibility. The administrative law judge indicated that he found the testimony of Ms. Mendini, Ms. Pollich, Ms. Wilson and Ms. Dunton to be credible regarding statements attributed to [Seib] and her failure to perform her job duties. The commission agrees with such credibility assessment. The administrative law judge did not believe that the actions/inactions of [Seib] rose to the level of misconduct. The commission disagrees with such conclusion. Therefore, the commission's reversal is not based on a differing assessment of witness credibility but upon a different legal conclusion when applying facts of the case to the law.

LIRC also concluded that:

[T]he actions of [Bernhardt] in participating in the slowdown contrary to the union contract, which resulted in decreased production for the employer, did evince a wilful and substantial disregard of the employer's interests and the standards of conduct the employer has a right to expect of its employes. The note authored by [Bernhardt] indicates not an adherence to the confines of the contract, but an intentional failure to perform her work duties up to her capabilities. In this case, the employer had a right to expect [Bernhardt's] best effort in her work. This is particularly so where, as here, [Bernhardt] had other legal and contractually granted means of expressing her dissatisfaction with the employer's reorganization. [Bernhardt] could have expressed her disagreement through the lawful grounds of declining to work voluntary Saturdays. Instead, [Bernhardt] intentionally withheld the effort which every employer has a right to expect.

306

. . . .

> The commission did consult with the administrative law judge regarding witness credibility and demeanor. The administrative law judge found the testimony offered by the employer's witnesses to be credible. In addition, the administrative law judge did not find credible the employe's explanations for writing the note. The commission agrees with such credibility assessment. Thus, the commission has reversed the appeal tribunal decision not based on a differing assessment of witness credibility or demeanor but upon reaching a different legal conclusion when applying the facts of this case to the law.

As an initial matter, we conclude that LIRC's factual findings are supported by substantial and credible evidence in the record and are therefore binding on this court. The actions of Appellants demonstrate their involvement in a "slowdown" and not simply a "work to rule" campaign. There is no dispute that the evidence on which the findings are based is relevant, probative and a quantum upon which a reasonable fact finder could base a conclusion that Appellants' withholding of effort contributed to the drastic decrease in production between August 30 and September 23, 1993. *See R.T. Madden, Inc. v. DILHR*, 43 Wis. 2d 528, 548, 169 N.W.2d 73, 82 (1969).

We further conclude that LIRC's determination, that the facts of record constituted misconduct under § 108.04(5), STATS., was appropriate. By participating in the "slowdown," Appellants' conduct clearly evinced a wanton disregard for the interests of Briggs & Stratton in meeting its production plan while simultaneously implementing the reorganization plan

307

in cooperation with the union. The union contract, as well as comments by union representatives, provided sufficient notice to Appellants that participation in a "slowdown" was an explicit violation of the no-strike, no-slowdown provision of the union contract. Nevertheless, the evidence indicates that both Seib and Bernhardt worked at less than normal production levels—Seib allowed motors to back up and even wrote letters while on the job, and Bernhardt scolded other shifts for producing too much and encouraged others to slow down as well. Accordingly, our review of the record leads us to conclude that Appellants were discharged from Briggs & Stratton for misconduct as that term is utilized in § 108.04(5).[3]

Appellants also maintain that LIRC's decision fails to articulate a reason for contradicting the factual determination of the ALJ. Appellants argue that § 227.46(2), STATS., requires LIRC to set forth any variance from the ALJ's decision. Appellants' view of the law is mistaken.

---

[3] Appellants have also contested LIRC's conclusion that they were suspended for good cause. However, the good cause standard for suspension under § 108.04(6), STATS., amended by 1995 Wis. Act 440 § 71, is a lesser standard than the misconduct standard found in § 108.04(5). It is undisputed that Appellants were suspended for the same reasons that they were discharged. It is implicit in our conclusion that Appellants were discharged for misconduct and that they were also suspended for good cause. Accordingly, we decline to further address Appellants' suspension argument. *See City of Waukesha v. Town Bd.*, 198 Wis. 2d 592, 608, 543 N.W.2d 515, 521 (Ct. App. 1995) (if a decision on one point disposes of an appeal, this court need not decide other issues raised).

We first note that § 102.23, STATS., controls the review of all worker's compensation orders, and not ch. 227 or § 801.02, STATS. Section 102.23(1)(a). Moreover, it is the rule in Wisconsin that where LIRC differs with its hearing examiner, acting as an appeal tribunal, in regard to material findings of fact based on an appraisal of the credibility of the witnesses, it must (1) consult the record with the examiner to glean his or her impressions of the credibility of the witnesses and (2) include an explanation for its disagreement with the examiner in a memorandum opinion. *Carley Ford, Lincoln, Mercury, Inc. v. Bosquette*, 72 Wis. 2d 569, 575, 241 N.W.2d 596, 599 (1976). Here, LIRC specifically noted its agreement with the ALJ's credibility determinations and explained its differing legal conclusions. We conclude that LIRC has not inappropriately disregarded the findings of fact and credibility determinations of the ALJ.

*By the Court.*—Judgment affirmed.