COURT OF APPEALS
DECISION
DATED AND FILED

April 28, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2018AP1940**

**STATE OF WISCONSIN**

Cir. Ct. No.  2017CV494

**IN COURT OF APPEALS
DISTRICT III**

SUSAN L. WELTER,

   PETITIONER-APPELLANT,

 V.

LABOR AND INDUSTRY REVIEW COMMISSION, STUDENT TRANSIT - EAU CLAIRE AND ACUITY INSURANCE COMPANY,

   RESPONDENTS-RESPONDENTS.

APPEAL from an order of the circuit court for Eau Claire County: MICHAEL A. SCHUMACHER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Susan Welter appeals an order affirming a decision of the Labor and Industry Review Commission. The Commission determined medical expenses associated with Welter's knee replacement surgery were not compensable, based on its finding that Welter had "fully healed" from her workplace injury before the surgery. On appeal, Welter argues the evidence the Commission relied on in support of that finding was not credible and substantial. We disagree and, therefore, affirm.

## BACKGROUND

¶2 In July 2003, Welter had a left knee arthroplasty—otherwise known as a knee replacement. In December 2009, Welter began working as a school bus monitor for Student Transit – Eau Claire. Welter had no work restrictions and worked for Student Transit for several years without any difficulties. However, in November and December of 2013, Welter sought medical treatment for pain in her left knee.

¶3 According to Welter's medical records, x-rays taken on November 8, 2013, and December 13, 2013, showed no evidence of a failure or loosening of the hardware implanted during her 2003 knee replacement surgery. Nevertheless, a December 16, 2013 bone scan indicated possible mechanical loosening of the hardware. On December 26, 2013, Welter told orthopedic surgeon Rusty Brand that she was experiencing "constant" knee pain that was exacerbated by any weightbearing activity. Brand reviewed the December 16 bone scan and noted it "does demonstrate possible loosening of the tibial component of [Welter's] left total knee arthroplasty."

¶4 Based on Welter's x-rays and bone scan, Brand informed Welter that she "certainly may have loosening of the tibial component of her total knee

arthroplasty in her left knee." He also told Welter that "if there is loosening of the implants then the only way to correct the problem would be revision total knee arthroplasty"—i.e., a second knee replacement. Brand therefore recommended knee replacement surgery as a treatment option. Welter responded that she did not believe there was anything loose in her knee, she did not wish to have knee replacement surgery at that time, and if she ever did have the surgery, she would have it in the summer so that she would not have to miss work.

¶5      Approximately three weeks later, on January 14, 2014, Welter slipped and fell in an icy parking lot while at work. Welter testified she landed on the front of her left knee, and she felt and heard her knee crack. She experienced pain and swelling in her left knee, and Student Transit's safety director told her to go to the emergency room. An x-ray taken that day showed "[n]o definite evidence of loosening or fracture" and "[n]o significant change" since Welter's December 13 x-ray.

¶6      On January 30, 2014, Welter saw Dr. Donald Bodeau, who diagnosed a "[w]ork related left knee contusion." Bodeau saw no "obvious change" in the x-rays taken before and after Welter's fall, but he noted that the pre-fall bone scan from December 16, 2013, showed "some highlighting of the patella and the tibial plateau area." Bodeau stated it "does appear that the work injury may have precipitated [Welter's] condition" and it "certainly exacerbated things."

¶7      Bodeau referred Welter to orthopedic surgeon Scott Cameron. On February 7, 2014, Cameron diagnosed Welter with "[k]nee pain, probably related to a loose tibial component, probably exacerbated significantly, beyond the usual progression, by a recent work-related fall." Cameron noted that Welter's "x-rays do not necessarily show any loosening, but the [December 16] bone scan ... does

appear as though its tibial component may be loose." He recommended knee replacement surgery if Welter's condition did not improve in three to four weeks.

¶8     Welter returned for an appointment with Bodeau on February 12, 2014. Bodeau noted Welter was "adamant" during that appointment that her workplace injury had caused the need for surgery on her left knee, even though testing before her fall had shown "obvious loosening" of the hardware from her prior knee replacement, and even though she had experienced symptomatic left knee pain before the fall. Bodeau stated that the loosening of Welter's knee replacement hardware "may have been exacerbated by the work injury, but it is not fully clear that it has been precipitated, aggravated and accelerated beyond its usual progression."

¶9     A second bone scan on February 26, 2014, showed findings "consistent with a potential healing fracture of the left patella or significant loosening of the patellar component of the prosthesis." The February 26 bone scan also demonstrated a "[p]robable mild strain underlying the tibial component of the left knee prosthesis."

¶10     Cameron performed a second knee replacement surgery on Welter's left knee on March 3, 2014. During the surgery, Cameron replaced loose components in both the tibia and patella.

¶11     Both Student Transit and Welter subsequently obtained medical opinions regarding the extent of Welter's workplace injury. Student Transit retained orthopedic surgeon Richard Lemon to review Welter's medical records. In a report dated May 5, 2014, Lemon opined that Welter's workplace fall had caused only a left knee contusion, which had resolved by February 14, 2014, with no permanent partial disability. Lemon also opined that any loosening of the hardware from

Welter's first knee replacement was unrelated to Welter's workplace injury, as was any medical treatment after February 14, 2014, including Welter's second knee replacement.

¶12 In support of his opinions, Lemon noted that Welter began having increasing left knee symptoms in the autumn of 2013; that the December 16, 2013 bone scan showed loosening of the left knee tibial component; and that Brand recommended surgery due to that loosening on December 26, 2013—approximately three weeks before Welter's workplace injury. Lemon also observed that Welter's x-rays taken before and after the workplace injury were identical.

¶13 Lemon examined Welter on August 22, 2014, and authored a second report dated August 26. In that report, Lemon reiterated his prior opinion that Welter's "need for a left total knee arthroplasty revision was clearly established in December of 2013, three weeks prior to her on-the-job injury of January 14, 2014." Lemon also reiterated that Welter's workplace injury "was a left knee contusion only," which had resolved by February 14, 2014, with no permanent partial disability.

¶14 Welter relied on a report authored by Bodeau. Bodeau opined it was "probable Ms. Welter's January 14, 2014, work incident caused a left knee disability by precipitation, aggravation, and acceleration of a pre-existing progressively deteriorating or degenerative condition beyond normal progression." Bodeau further opined it was probable that Welter's workplace fall "damaged the patellar component" of her left knee and "caused additional loosening of the tibial component." Finally, Bodeau opined that Welter's workplace injury "required [that] she undergo revision of her left total knee replacement earlier than she may have otherwise."

¶15 On June 13, 2014, Welter filed a worker's compensation claim against Student Transit, seeking compensation for temporary total disability from January 14, 2014, to May 29, 2014; 50% permanent partial disability; and medical expenses. Welter, Student Transit, and Acuity Insurance Company (Student Transit's insurer) ultimately entered into a limited compromise agreement regarding Welter's claim, which the Department of Workforce Development approved in October 2014. The limited compromise agreement was a full and final compromise of all claims arising out of Welter's workplace injury, except for any future claim for reimbursement of treatment expenses paid by Medicare through October 6, 2014, and any claim for treatment expenses incurred by Welter after that date.

¶16 Welter subsequently filed a second worker's compensation claim seeking an additional $14,000 in medical expenses to reimburse Medicare for costs associated with her post-injury knee replacement. Following a hearing, an administrative law judge (ALJ) issued a decision denying Welter's claim. The ALJ found that Lemon's report was more credible than Bodeau's with respect to the cause of Welter's post-injury knee replacement. The ALJ reasoned:

> [T]he applicant had significant prior knee problems, undergoing prior replacement of both knees. This is not a case where the onset of symptoms occurred contemporaneously with the work injury. Although the applicant testified that prior to the fall, her left knee was fine and she had no restrictions, the medical records reveal she sought treatment with Dr. Rusty C. Brand for pain in both knees in November of 2013, then specifically her left knee on December 13, 2013, and again on December 26, 2013[]. At the time of the December 26, 2013, examination, barely one month before the fall at work, the applicant reported to Dr. Brand that she was having a lot of pain especially with any weight bearing activity. Dr. Brand suspected loosening of the tibial component and suggested surgery. The applicant stated the knee was so problematic that she would consider surgery for the spring or early summer of 2014. Dr. Lemon noted that x-rays taken of the knee after the fall at work were identical to x[-]rays taken before the fall[.]

> There was no objective evidence[] revealing any loosening of the tibial or patellar component of her arthroplasty as a result of her fall.

¶17 The ALJ credited Lemon's opinion that Welter's workplace fall caused only a left knee contusion, which did not result in any permanent disability or require any medical treatment after February 14, 2014. The ALJ therefore concluded Welter had not established that Student Transit and Acuity were liable for any medical expenses beyond those they had already conceded and paid.

¶18 Welter petitioned the Commission for review of the ALJ's decision, and the Commission affirmed. Like the ALJ, the Commission found—based on Lemon's opinion—that Welter had "fully healed from the effects of the slip and fall as of February 14, 2014, without permanent disability, the need for permanent work restrictions, or the need for additional treatment." The Commission therefore dismissed Welter's claim for additional medical expenses associated with her post-injury knee replacement. Welter sought judicial review of the Commission's decision, and the circuit court affirmed. Welter now appeals.

## DISCUSSION

¶19 On appeal, we review the Commission's decision, rather than that of the circuit court. *Honthaners Rests., Inc. v. LIRC*, 2000 WI App 273, ¶8, 240 Wis. 2d 234, 621 N.W.2d 660. Welter challenges only the Commission's factual findings. In the absence of fraud, the Commission's findings of fact are conclusive, as long as they are supported by credible and substantial evidence. WIS. STAT. § 102.23(1)(a)1., (6) (2017-18);[1] *Kowalchuk v. LIRC*, 2000 WI App 85, ¶7, 234 Wis. 2d 203, 610 N.W.2d 122. Credible and substantial evidence is "relevant,

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

credible, and probative evidence upon which reasonable persons could rely to reach a conclusion." *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 54, 330 N.W.2d 169 (1983). "Substantial evidence is less of a burden than [a] preponderance of the evidence in that any reasonable view of the evidence is sufficient." *Bernhardt v. LIRC*, 207 Wis. 2d 292, 298, 558 N.W.2d 874 (Ct. App. 1996).

¶20    Where two conflicting views of the evidence may be sustained by substantial evidence, it is for the Commission to determine which view of the evidence it wishes to accept. *See Hamilton v. DILHR*, 94 Wis. 2d 611, 620, 288 N.W.2d 857 (1980). When determining whether credible and substantial evidence supports the Commission's factual findings, a court may not "substitute its judgment for that of the commission as to the weight or credibility of the evidence." WIS. STAT. § 102.23(6). As particularly relevant to this case, the Commission "is the 'sole judge of the weight and credibility' of medical witnesses." *Conradt v. Mt. Carmel Sch.*, 197 Wis. 2d 60, 68, 539 N.W.2d 713 (Ct. App. 1995) (citation omitted). "[I]f there are contradictory medical reports, it is for [the Commission] to decide if one expert's testimony is more persuasive than another's." *Id.* at 69.

¶21    Here, the Commission found that Welter's workplace injury had fully healed by February 14, 2014, without the need for additional medical treatment. That finding is supported by credible and substantial evidence in the record. Specifically, both the Commission and the ALJ credited Lemon's expert medical opinion that Welter's "need for a left total knee arthroplasty revision was clearly established in December of 2013, three weeks prior to her on-the-job injury of January 14, 2014." In support of that opinion, Lemon observed that Welter began having increasing left knee symptoms in the autumn of 2013; that the December 16, 2013 bone scan showed loosening of the left knee tibial component; and that Brand had recommended surgery due to that loosening on December 26, 2013—

approximately three weeks before Welter's workplace injury. Lemon also observed that Welter's x-rays taken before and after the workplace injury were identical.

¶22 Lemon further opined that the only injury Welter sustained on January 14 was "a left knee contusion." In support of that opinion, he observed that on January 30, 2014, Bodeau diagnosed Welter with a "[w]ork related left knee contusion." On that date, Bodeau also noted there was no "obvious change" in the x-rays taken before and after Welter's fall. Lemon opined that the "vast majority of knee contusions heal uneventfully within one month with no permanent partial disability."

¶23 Based on Lemon's opinions, a reasonable person could find that Welter's workplace injury had fully healed by February 14, 2014, without the need for additional medical treatment. *See* ***Princess House***, 111 Wis. 2d at 54. We acknowledge that other evidence in the record—in particular, Bodeau's report—may have supported a contrary finding. However, when credible and substantial evidence supports multiple findings, it is for the Commission to determine which view of the evidence it wishes to accept. *See* ***Hamilton***, 94 Wis. 2d at 620. Moreover, the Commission is the sole judge of the weight and credibility of medical witnesses' opinions, and it was therefore free to determine that Lemon's opinions were more persuasive that Bodeau's.[2] *See* ***Conradt***, 197 Wis. 2d at 68-69.

---

[2] Notably, although Bodeau opined in his report that Welter's workplace fall precipitated, aggravated, and accelerated her pre-existing knee condition beyond its normal progression, his own initial diagnosis that Welter sustained only a left knee contusion undermines that opinion. In addition, while Bodeau stated in a February 12, 2014 treatment note that the loosening of Welter's knee replacement hardware "may have been exacerbated by [her] work injury," he conceded it was "not fully clear that [the loosening] has been precipitated, aggravated and accelerated beyond its usual progression." We also observe that although Cameron stated on February 7, 2014, that Welter's knee pain was "probably related to a loose tibial component" and was "probably exacerbated significantly, beyond the usual progression, by a recent work-related fall," he acknowledged that Welter's pre-fall bone scan showed the "tibial component may be loose."

¶24 Welter's arguments that the Commission erred by relying on Lemon's opinions are unpersuasive. Welter asserts Lemon's opinions are incredible, as a matter of law, because they were completely discredited by other evidence in the record, and a reasonable person therefore could not rely on Lemon's opinions to reach a conclusion. *See Princess House*, 111 Wis. 2d at 53-54 (stating we must look to the whole record to determine whether an item of evidence that the Commission relied upon was "relevant, probative, and of a nature that it was not completely discredited as a matter of law by other uncontrovertible facts").

¶25 Specifically, Welter asserts that Lemon failed to consider her February 26, 2014, post-injury bone scan when formulating his opinions. Welter argues the February 26 bone scan "objectively and conclusively demonstrated either a fracture or loosening of the patellar component of Ms. Welter's arthroplasty." She therefore contends the scan provides "actual objective evidence of anatomical change to the knee" as a result of her workplace fall, and, as such, it completely discredits Lemon's opinion to the contrary.

¶26 We agree with the Commission that Welter overstates the significance of the February 26 bone scan. Contrary to Welter's assertion, the bone scan does not "conclusively" demonstrate either a fracture or loosening of the hardware from her first knee replacement. Instead, the record reflects that the bone scan showed findings "consistent with a *potential* healing fracture of the left patella *or* significant loosening of the patellar component of the prosthesis." (Emphases added.) That the bone scan was consistent with a "potential" fracture is not conclusive evidence that such a fracture, in fact, existed, nor that the fracture necessitated the subsequent surgery. Notably, an x-ray taken on the day of Welter's fall showed no significant change from a pre-fall x-ray and revealed "[n]o definite evidence of loosening or fracture."

¶27 Moreover, the possible loosening of Welter's prosthesis shown on the February 26 bone scan was not a new finding. Instead, Brand had noted on December 26, 2013—approximately three weeks before Welter's fall—that a December 16 bone scan demonstrated "possible loosening of the tibial component of [Welter's] left total knee arthroplasty." Brand also stated on December 26 that the December 16 bone scan, Welter's x-rays, and her clinical symptoms were "suggestive of aseptic loosening." Under these circumstances, the February 26 bone scan does not conclusively demonstrate that any loosening of Welter's prosthesis was caused by her workplace fall. Thus, even in light of the February 26 bone scan, the Commission did not err by adopting the ALJ's finding that there was "no objective evidence[] revealing any loosening of the tibial or patellar component of [Welter's] arthroplasty *as a result of her fall*." (Emphasis added.)

¶28 In addition, Welter's assertion that Lemon failed to consider the February 26 bone scan lacks merit. Lemon's May 5, 2014 report includes a summary of Welter's medical records from April 14, 1999, to March 19, 2014. That summary contains the following entry: "02/26/14—Bone scan. Positive 3-Phase bone scan with a potential healing fracture of the left patella or significant loosening of the patellar component of the prosthesis, mild strain underlying the tibial component of the left knee prosthesis, and mild degenerative changes of all three compartments of the right knee." Thus, Lemon was clearly aware of the February 26 bone scan when he rendered his opinions. The fact that he did not mention the bone scan in the "Discussion" section of his report does not show that he failed to consider it. Rather, it merely suggests—consistent with our above analysis—that Lemon did not view the bone scan as providing definitive evidence of a fracture or of any new loosening of Welter's prosthesis.

¶29 Welter also takes issue with Lemon's opinion that her workplace fall "caused a left knee contusion only." Again, she argues that opinion "is contrary to the actual objective evidence of anatomical change to the knee demonstrated on the [February 26] bone scan." We reject this argument for the same reasons discussed above—namely, that the February 26 bone scan merely indicated a *potential* fracture or loosening of Welter's prosthesis. Moreover, as previously noted, the record contains evidence that loosening of the prosthesis had already occurred as of December 16, 2013—approximately one month before Welter's workplace fall. In addition, Lemon's opinion that the fall caused only a left knee contusion is consistent with Bodeau's initial diagnosis on January 30, 2014, that Welter had sustained a "[w]ork related left knee contusion." We therefore reject Welter's assertion that the February 26 bone scan completely discredits Lemon's opinion that Welter's workplace fall caused only a left knee contusion.

¶30 For the reasons stated above, we conclude credible and substantial evidence supported the Commission's factual finding that Welter's workplace injury had fully healed by February 14, 2014, without the need for additional medical treatment. In light of that finding, the Commission properly concluded that Student Transit and Acuity were not liable for any medical expenses associated with Welter's March 3, 2014 knee replacement surgery. The relevant statute, WIS. STAT. § 102.42(1), requires an employer to pay medical and surgical expenses "as may be reasonably required to cure and relieve from the effects of [an employee's workplace] injury." Here, given the Commission's finding that Welter's workplace injury had fully healed as of February 14 and did not require additional medical treatment after that date, the only reasonable conclusion is that Welter's March 3 knee replacement was not "reasonably required" to treat her injury. We therefore affirm the circuit court's order affirming the Commission's decision.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.