# COURT OF APPEALS
## DECISION
## DATED AND FILED

## August 23, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2021AP1155**

Cir. Ct. No. 2020CV5816

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT I**

---

**KINA MURFF,**

  **PLAINTIFF-APPELLANT,**

  **V.**

**LABOR AND INDUSTRY REVIEW COMMISSION, AURORA HEALTH CARE METRO, INC. AND SENTRY CASUALTY COMPANY,**

  **DEFENDANTS-RESPONDENTS.**

---

APPEAL from an order of the circuit court for Milwaukee County: CARL ASHLEY, Judge. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

¶1    BRASH, C.J.   Kina Murff appeals the decision of the circuit court affirming the decision of the Labor and Industry Review Commission (LIRC), which dismissed her application for worker's compensation benefits. LIRC rejected Murff's claim that her back condition was caused or aggravated by an injury she

sustained while working for Aurora Health Care Metro, Inc. in April 2010. The circuit court upheld LIRC's decision. Upon review, we affirm.

## BACKGROUND

¶2 Murff began working for Aurora in June 2008. She worked full time at St. Luke's Medical Center as a third-shift housekeeper. Her duties included cleaning and restocking bathrooms, carrying dirty linens to the laundry chute, dusting offices, mopping floors, and picking up garbage.

¶3 Murff asserts that she sustained a work injury on April 9, 2010. She explained that she was on a ladder in a closet, reaching to get a box from a shelf. When she grabbed the box to lift it down from the shelf, she stated she heard something "pop" in her lower back. She said she experienced "throbbing pain" and "numbness" as a result. She reported the incident to her supervisor at the end of her shift.

¶4 Murff filed for worker's compensation benefits in 2016. The claim alleged several periods of temporary total disability between 2014 and 2018, for which she was seeking lost wages in an amount totaling over $70,000. The claim also stated that Murff would require prospective medical treatment, and had 100% loss of earning capacity.

¶5 Murff advanced three theories for recovery in her worker's compensation claim: (1) that the work incident in April 2010 was a direct cause of her back problems; (2) that if not a direct cause, it was probable that the work incident precipitated, aggravated, and accelerated a pre-existing degenerative condition beyond its normal progression; or (3) that Murff's job duties while

2

working for Aurora were a material contributory causative factor of her back condition's onset or progression.

¶6      A hearing before an administrative law judge (ALJ) was held in June 2019. Murff testified about the work injury to her back that she allegedly sustained. Murff maintained that she never had any of the issues she suffers from prior to working for Aurora. In fact, Murff testified that in order to get the job with Aurora, she had to pass an "extensive" physical exam, which included testing her physical capacity to perform the required duties. However, there is no evidence of any pre-employment physical exam in the record.

¶7      Murff further testified that even before the work injury incident, approximately three to four months after her employment with Aurora began, she started experiencing back pain. She eventually went to see her doctor, Dr. Ricardo Sinense, regarding the pain; she testified that she discussed her job duties with Dr. Sinense. Dr. Sinense's report of that visit described a variety of health problems, including neuritis, but it did not reference that these issues were work-related, and he did not complete a WKC-16-B form—the Department of Workforce Development's form for workplace injury claims. Dr. Sinense referred Murff to a neurologist, Dr. Anjum M. Razzaq.

¶8      Murff saw Dr. Razzaq in March 2010, about two weeks prior to her claimed work injury incident. Dr. Razzaq's report described Murff's symptoms as "intermittent numbness involving the left foot as well as severe headache, neck pain, right shoulder pain and back pain." He described the numbness as being "insidious in origin," and noted that Murff was at that time taking Gabapentin, Vicodin, Tramadol, and Meloxicam.

¶9 Dr. Razzaq ordered an MRI of Murff's head, right shoulder, cervical spine, and lumbar spine. The MRI was eventually completed on April 22, 2010—approximately two weeks *after* the injury incident. Dr. Razzaq observed that the results of the MRI were "unremarkable"; it showed "minimal facet degeneration," but no evidence of disc herniation. Furthermore, Dr. Razzaq noted that Murff had not previously informed him that this was a work-related issue; he discovered this when a registered nurse "showed up" at his office and asked him to call her regarding Murff's "now reported work[-]related injury." When Dr. Razzaq questioned Murff about it, she explained that she "forgot to mention it" and told him "not to worry about it and just complete [the] evaluation." Dr. Razzaq opined in his report that he did not consider Murff's case as qualifying for worker's compensation benefits.

¶10 Murff also saw Dr. Sinense again after the injury incident. He issued work restrictions for Murff that included not lifting anything over ten pounds, and no pushing or pulling. These restrictions were to stay in place only until April 22, 2010. Aurora could not accommodate the restrictions, so Murff began collecting short-term disability benefits. She returned to work on May 10, 2010, resuming her normal work duties.

¶11 Murff eventually left her employment with Aurora in January 2012 claiming she could no longer work due to her back pain, and that Aurora could not accommodate her restrictions. However, Aurora argued that Murff had no restrictions when she returned to work in May 2010, and worked for over nineteen months after the injury incident without further restrictions, until she "stopped showing up for work" in January 2012.

¶12 Over the years, Murff saw various doctors for back pain, leg, knee, and hip pain, as well as for a myriad of other health issues. This extensive medical history was submitted for review relative her worker's compensation claim, summarized as follows.

¶13 First, evidence was presented that in May 2008—about a month prior to Murff starting work for Aurora—Murff visited the emergency room complaining of numbness in her left arm and leg; she was admitted based on concerns she was having a stroke. Instead, the doctor who treated her opined that the cause of her numbness was "more likely related to musculoskeletal pain originating from her left shoulder."

¶14 After seeing Dr. Sinense and Dr. Razzaq in March and April 2010 as described above—shortly before and after the work incident—Murff's next medical record was for an emergency room visit for chest pain in September 2010. It was noted that she was given a musculoskeletal exam at that time, and reported back pain.

¶15 Then in January 2011, almost a year after the work incident, Murff began seeing Dr. Waleed S. Najeeb. Her first appointment with Dr. Najeeb was for an asthma evaluation and pelvic pain, and he noted that Murff had "no back pain, muscle aches or localized joint pain." However, two days after that appointment, Murff went to the emergency room for "constant aching pain over her left upper mid and lateral back with intermittent sharp pain." The record notes that there was "[n]o clear inciting event" for the pain and that Murff stated she had "never experienced pain like this before." Murff subsequently saw Dr. Priya Asija in December 2011 for "lumbar pain that was aching and sharp," without any numbness

or tingling in her legs. Murff told Dr. Asija that the pain had been present for one week, and that it was not work related.

¶16 Murff saw Dr. Najeeb again in January 2012, and brought paperwork relating to short-term disability benefits. Dr. Najeeb observed that Murff was "screaming from pain with just touching the knee[.]" He noted in a subsequent appointment the following month that Murff had complained of back and knee pain "for four months" but there was "[n]o history of injury to the extremity." An MRI of her lumbar spine performed at the end of January 2012 showed some degenerative changes.

¶17 Dr. Najeeb referred Murff to a pain management doctor, Dr. Anil Warrier, whom she saw in March 2012. Dr. Warrier's notes describe Murff's condition as back pain that she had "off and on for about 2 years" which was "spontaneous in onset. She does not recall any preceding trauma or unusual activities." Dr. Warrier observed the "mild degenerative changes" in Murff's back and opined that she had chronic musculoskeletal pain syndrome, prescribing analgesics as necessary and physical therapy.

¶18 Dr. Najeeb also referred Murff to Dr. Kathryn D. Gaines in April 2012 for "left-sided weakness." Dr. Gaines noted Murff's complaints of pain in her left shoulder, back, arm, and leg. Dr. Gaines also opined that Murff's "clinical findings and exam are confounded by the fact that [Murff] is unable to provide full oppositional testing," which the doctor attributed partly to pain, but suggested it was also due in part to "poor effort."

¶19 Later in April 2012, Murff saw Dr. Nikhil Patel for a neurological evaluation. Dr. Patel described Murff's pain as being in her "whole back" and radiating down to her left lower extremity. According to Dr. Patel's report, Murff

told him that the onset of the pain was "sudden" after a "work related injury in 2/2010." Murff received steroid injections and nerve blocks for her back pain, as well as for shoulder tenderness, in May and June 2012.

¶20 In September 2013, Murff again went to the emergency room with back pain, which the doctor found was likely due to her degenerative joint disease. She visited the emergency room again in November 2013 for abdominal pain, which she believed was related to her kidneys and thought she needed a transplant; the doctor concluded it was constipation.

¶21 In December 2013, Murff saw Dr. Pamela Y. Thomas-King for treatment for low back pain. Dr. Thomas-King noted that Murff's pain had begun over three years prior "after a work-related accident." Dr. Thomas-King assessed Murff as having a degenerative disc condition as well as hyperlipidemia, diabetes, and asthma. Dr. Thomas-King made no recommendations for medication, physical therapy, or psychological services.

¶22 Murff then saw Dr. Mohammed K. Heder later in December 2013 for a second opinion. Dr. Heder reviewed Murff's MRI, noting that it showed no disc herniation, and that these findings "did not explain [Murff's] pain." Dr. Heder further stated that he was unable to fill out the disability form Murff had "due to lack of information." He also suspected that Murff suffered from post-traumatic stress disorder.

¶23 In February 2014, Murff was treated by Dr. Yash S. Pannu. Dr. Pannu ordered a new MRI, which showed mild to moderate degenerative changes. Murff had a back procedure performed by Dr. Thomas-King in March 2014, and another procedure performed by Dr. Pannu in November 2014. Dr. Pannu also performed back surgery on Murff in June 2016 to repair a fractured vertebrae. Dr. Pannu later

recommended lumbar fusion in September 2017. Murff's treatment during this time also included pain medication and joint injections, as well as a trial of a spinal cord stimulator.

¶24   Murff also continued treatment with Dr. Najeeb during this time for pain management for her lower back, as well as diabetic neuropathy and fibromyalgia. Additionally, she was diagnosed with depression and anxiety, and was referred to a psychiatrist. Murff also received physical therapy for her condition; a note from her therapist in November 2017 indicated that she showed signs of "inconsistent performance": that she was "ambulating with good gait" until the therapist mentioned testing, at which time Murff "immediately began limping, slowed her cadence, [and] demonstrated abnormalities of gait." The therapist noted that an occupational therapist had also seen similar inconsistent performance.

¶25   Murff was involved in a motor vehicle accident in December 2017. She went to the emergency room for back pain, but x-rays showed no acute fractures.

¶26   A CT scan of Murff's lumbar spine done in February 2018 showed advanced degenerative changes. A Functional Capacity Evaluation was done in December 2018, which noted that Murff's "subjective complaints" were "in proportion with objective findings" relating to her back condition, and that "no significant exaggerated pain behaviors were observed[.]" The evaluation stated that Murff should be limited to sedentary work.

¶27   Murff obtained WKC-16-B forms from several of her treating physicians which related her back problems back to the work incident of April 2010: Dr. Najeeb, Dr. Pannu, Dr. Thomas-King, and Dr. Patel. Aurora thus engaged Dr. Alvin K. Krug to perform an independent medical exam of Murff. Dr. Krug's first

exam was performed in November 2016. Dr. Krug noted the inconsistencies between Murff's assertions about the work injury event and her symptoms and what was reflected in the medical records, including the fact that the onset of her symptoms occurred before the incident, as she was already on pain medication at that time. Furthermore, the MRI done shortly after the work incident showed only minimal degenerative changes, but no injury. He opined that Murff's back problems were "structurally minimal, but symptomatically quite high," and were more likely psychological. He therefore concluded that all three of her theories relating to causation—that the work incident was a direct cause of her back pain; that it precipitated, aggravated, and accelerated a pre-existing degenerative condition beyond its normal progression; or that her work duties were a material contributory causative factor of the onset or progression of her back pain—should be rejected.

¶28 Dr. Krug performed another exam of Murff in January 2018, after her back surgeries. He maintained his opinion regarding causation, and again opined that her subjective pain complaints were disproportionate to the objective findings. He cited the American Psychiatric Association Guidelines as supporting his suspicion of malingering. Dr. Krug performed an additional medical records review in May 2019, opining that Murff had given "false and misleading information to her providers as to the onset of her condition." He stated that these additional records also supported his opinion regarding malingering.

¶29 Regardless of causation, Dr. Krug assessed Murff at 60% total permanent partial disability. Nevertheless, a vocational evaluation determined that because Murff had been found capable of doing sedentary work, she would sustain no loss of earning capacity for worker's compensation purposes.

¶30    The ALJ, however, found that Murff was entitled to worker's compensation benefits. He found Dr. Krug's reports to have "diminish[ed] … credibility," particularly noting the "large gap in time" between the work incident in April 2010 and Dr. Krug's exams in November 2016 and January 2018; the ALJ did not reference the additional records review Dr. Krug performed in May 2019. Rather, the ALJ "credit[ed] the treating physicians" who had related Murff's back pain to the work incident, and found that Murff had "sustained a work-related injury to her back[.]"

¶31    LIRC reversed that decision. As we discuss further below, LIRC found credibility issues with the opinions of the treating physicians who related Murff's back problems to the work incident. LIRC also noted problems with Dr. Krug's opinion. However, LIRC ultimately determined that Murff had not met her burden of proving her claim.

¶32    Murff then filed a complaint with the circuit court appealing LIRC's decision. The court noted that despite the WKC-16-B forms from some of her treating physicians opining that her back problems were work-related, they "displayed varying etiologies and level of disability." The court further observed that although the record "could support a benefit award," that is not the proper standard for the court's review, and explained that the record also supported LIRC's finding of legitimate doubt as to Murff's claim. Therefore, the court affirmed LIRC's determination. This appeal follows.

## DISCUSSION

¶33    In its decision, LIRC rejected all three of Murff's theories for recovery regarding causation of her back condition. On appeal, this court reviews LIRC's factual findings and legal conclusions, not those of the circuit court. ***Mueller v.***

*LIRC*, 2019 WI App 50, ¶17, 388 Wis. 2d 602, 933 N.W.2d 645. We may only set aside an order issued by LIRC if (1) LIRC acted "without or in excess of its powers"; (2) the order was "procured by fraud"; or (3) the findings of fact by LIRC do not support the order. *See* WIS. STAT. § 102.23(1)(e) (2019-20);[1] *see also Patrick Cudahy Inc. v. LIRC*, 2006 WI App 211, ¶5, 296 Wis. 2d 751, 723 N.W.2d 756. "In a worker's compensation hearing, the employee has the burden of proving the elements of his or her claim, and on appeal he or she also has the burden to show that LIRC's decision should be overturned." *Kowalchuk v. LIRC*, 2000 WI App 85, ¶8, 234 Wis. 2d 203, 610 N.W.2d 122.

¶34    We review LIRC's legal conclusions *de novo*; however, we defer to LIRC's findings of fact "if they are supported by credible and substantial evidence." *Mueller*, 388 Wis. 2d 602, ¶17. Credible evidence is that which is "sufficient to exclude speculation or conjecture." *Bumpas v. DILHR*, 95 Wis. 2d 334, 343, 290 N.W.2d 504 (1980). "Evidence that is relevant, probative, and credible, and which is in a quantum that will permit a reasonable factfinder to base a conclusion upon it," is substantial evidence. *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 54, 330 N.W.2d 169 (1983). The burden of showing that LIRC's decision was not supported by credible and substantial evidence "is on the party seeking to set aside LIRC's findings and order." *Xcel Energy Servs., Inc., v. LIRC*, 2013 WI 64, ¶48, 349 Wis. 2d 234, 833 N.W.2d 665.

¶35    In fact, it is "'an elementary principle' that the claimant has the burden of proving beyond a legitimate doubt all the facts essential to the recovery of compensation." *Leist v. LIRC*, 183 Wis. 2d 450, 457, 515 N.W.2d 268 (1994)

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

(citation omitted). To that end, "[i]t is LIRC's duty to deny benefits if it finds that a legitimate doubt exists regarding the facts necessary to establish a claim." ***Id.*** "A legitimate doubt comprises 'some inherent inconsistency ... or conflict in the testimony.'" ***Kowalchuk***, 234 Wis. 2d 203, ¶8 (citation omitted; ellipses in original).

¶36   However, LIRC "cannot reject a medical opinion unless there is something in the record to support its rejection." ***Leist***, 183 Wis. 2d at 460. LIRC is not "require[d] … to provide countervailing medical expert opinions to support a legitimate doubt," but it may not "rel[y] on its own 'cultivated intuition'" to reach a conclusion regarding a claim for benefits. ***Id.*** at 461-62.

¶37   Murff argues that she has presented a prima facie case that the injury incident of April 2010 was the cause of her back problems, based on the reports of the doctors who stated that the injury incident, or her work duties in general, were a causative factor of her condition. In support of her argument, she cites ***E.F. Brewer Co. v. DILHR***, 82 Wis. 2d 634, 264 N.W.2d 222 (1978), where our supreme court stated that "two items of evidence" in the record for that case—the testimony of the claimant and his doctor's report—are "sufficient to support the award of compensation," even though the claimant's statement was undoubtedly "self-serving," and the doctor's report "in respect to the circumstances of the initial injury and pain is but a recapitulation" of the claimant's self-serving statement. ***Id.*** at 637.

¶38   However, this was not the entirety of the court's analysis in that case. The court went on to observe that there was competing evidence in the record of a pre-existing condition which pre-dated the work-related incident by "five or six months," and that "if given full credence," that evidence "would be inconsistent with the employee's claim of work-connected disability." ***Id.*** at 639. The court

12

stated that the department "chose to disbelieve those statements," which was "simply a matter of credibility." *Id.*

¶39     Murff also cites to *Beecher v. LIRC*, 2004 WI 88, 273 Wis. 2d 136, 682 N.W.2d 29, for the premise that if a claimant presents a prima facie case, that "represents a burden of production that, in the absence of adequate rebuttal evidence, satisfies the burden of persuasion on the issue involved." *Id.*, ¶52. However, this statement in *Beecher* was in the context of discussing the odd-lot doctrine, a "judge-made exception to the general rule that permanent total disability awards under worker's compensation law are based on proof of total loss of earning capacity." *Id.*, ¶44. The court explained:

> [W]here a claimant makes a prima facie case that he has been injured in an industrial accident and, because of his injury, age, education, and capacity, he is unable to secure any continuing and gainful employment, the burden of showing that the claimant is in fact employable and that jobs do exist for the injured claimant shifts to the employer.

*Id.*, ¶32 (citation omitted; alteration in *Beecher*). The *Beecher* court went on to conclude that this burden shift to the employer is "*only* as to the sub-issue of whether a job exists that the claimant can do" as it relates to that claimant's claim for total disability benefits, and that "[t]he burden of persuasion on the other aspects of the claimant's case for permanent total disability benefits remains, as always, with the claimant." *Id.*, ¶55.

¶40     Here, the matter of total permanent disability benefits is not at issue; the ALJ's award was for temporary total disability. In fact, he specifically stated that a ruling regarding loss of earning capacity would be "premature" because evidence was presented that Murff was continuing her education at that point, which

would have an effect on her future earning capacity. Thus, **Beecher** is inapposite in this case.

¶41     Indeed, the issue here is whether Murff proved her claim, since LIRC determined that she did not. It is the function of LIRC, not this court, to "determine the credibility of evidence or of witnesses, and … to weigh the evidence and to decide what should be believed." **E.F. Brewer**, 82 Wis. 2d at 636-37. Furthermore, a reviewing court may not "substitute [its] judgment for [LIRC]'s." **Beecher**, 273 Wis. 2d 136, ¶20. Moreover, if "different inferences can reasonably be drawn from the evidence, then a question of fact is presented and the inference actually drawn by [LIRC], if supported by any credible evidence, is conclusive." **Vocational, Tech. & Adult Ed., Dist. 13 v. DILHR**, 76 Wis. 2d 230, 240, 251 N.W.2d 41 (1977).

¶42     In this case, LIRC weighed the reports of Murff's treating physicians who indicated that the work incident was a causative factor in her back problems, and found them not to be credible for various reasons.[2] For example, Dr. Najeeb found the work incident to be a direct cause of Murff's back issues, but did not accurately describe the incident in his report, stating that Murff had been "lifting a heavy box above the shelves" rather than getting a box down from a shelf. This led LIRC to conclude that Dr. Najeeb misunderstood the nature of the work incident.

¶43     With regard to the report from Dr. Thomas-King, she initially stated that the work incident was a direct cause of Murff's back problems "given the patient's history," and aggravation of a pre-existing condition was not applicable. Her report also indicated that the work incident was at least a material contributory causative factor of the onset or progression of Murff's condition, again noting "the

---

[2] We note that none of Murff's treating physicians testified at the hearing before the ALJ.

patient's history." However, Dr. Thomas-King later amended her report to change her causation opinion to the incident being only a material contributory causative factor; furthermore, she provided no explanation for this change. LIRC also observed that the report contained no information relating to Murff's job duties, nor any information relating to how those duties could have resulted in an occupational work injury.

¶44 Dr. Pannu's report indicated the work incident was a direct cause of Murff's back problems as well, and accurately described that incident. However, LIRC observed that Dr. Pannu's report did not reference Murff being treated for similar symptoms prior to the work incident, which it believed indicated that Dr. Pannu did not have a complete medical history for Murff.

¶45 Dr. Patel's report—which required the assumption by LIRC that the report was prepared by Dr. Patel, as his name was not typed on the report—indicated that the work incident aggravated a pre-existing condition. However, the report did not include Murff's name, nor did it list Aurora as the employer. Additionally, the wrong date was listed for the work incident, and the incident was also mischaracterized as "lifting a heavy object overhead" as opposed to reaching to lift a box off the shelf.

¶46 Aside from these issues with the reports of her treating physicians, LIRC's decision emphasizes that the evidence demonstrates that Murff was developing the same symptoms of tingling, numbness, and pain prior to the work incident that she complained of after the incident. Furthermore, there was no objective evidence of injury to her back at the time of the incident in the MRI that was done shortly thereafter. Moreover, while LIRC recognized that Murff had mild degenerative changes in her back while she remained employed with Aurora, it

points out that her condition did not become significantly worse until several years *after* she left Aurora, which was nearly two years after the alleged injury incident. LIRC determined that this time frame presented a legitimate doubt as to whether her condition is work-related.

¶47     LIRC also concedes that Murff's job duties could have been a material contributory causative factor to the onset or progression of her back problems. However, it could not definitively make this finding due to the lack of a credible medical opinion about such causation, as well as the "very scant" evidence in the record as to her actual work activities.

¶48     LIRC acknowledges that Dr. Krug, the independent medical examiner for Aurora, did not provide "the most persuasive opinion" regarding the material contributory causative factor theory.  Dr. Krug stated that the "relatively short period of time" that Murff had worked for Aurora did not support this theory, but failed to explain why her time in that workplace—approximately three and one-half years—could not have caused or contributed to her condition.  Dr. Krug also characterized Murff as a malingerer, which LIRC found to be without foundation, because this was not noted in any of the reports relating to Murff's mental health issues.

¶49     Murff urges us to take LIRC's findings relating to Dr. Krug's report as a concession that proves LIRC erred in its decision, based on her citation to *E.F. Brewer*.  *See id.*, 82 Wis. 2d at 637.  However, as we stated above, the totality of the court's discussion in *E.F. Brewer* emphasized that the credibility analysis of *all* of the evidence is firmly within the province of LIRC, *see id.* at 636-37, and the inferences drawn by LIRC from competing evidence, if those inferences are

supported by the evidence, are conclusive, *see Vocational, Tech. & Adult Ed., Dist. 13*, 76 Wis. 2d at 240.

¶50     Moreover, LIRC was not required to provide a "countervailing medical expert opinion[]" to support its conclusion that there was legitimate doubt as to Murff's claim. *See Leist*, 183 Wis. 2d at 461.  Rather, there just needs to be "something in the record" to support its rejection of a medical opinion. *Id.* at 460. LIRC explained what caused it to doubt the veracity of the opinions of the doctors who had indicated the work incident was a cause of Murff's back problems.  Indeed, these findings were "simply a matter of credibility." *See E.F. Brewer*, 82 Wis. 2d at 639.

¶51     LIRC also referenced the evidence in the record which indicated that the onset of Murff's condition began prior to the work incident, that her condition did not appear to worsen for quite some time after the incident, and that she had a host of other physical and mental health issues that were likely factors in her condition.  Additionally, LIRC noted the evidence that was lacking in the record, such as a more detailed description of Murff's job duties that would support a finding that they were a material contributory causative factor to her back condition.

¶52     After reviewing the record, we conclude that LIRC's findings, and its ultimate conclusion that legitimate doubt existed as to Murff's claim, are supported by credible and substantial evidence and the reasonable inferences LIRC drew from that evidence. *See Kowalchuk*, 234 Wis. 2d 203, ¶8; *Vocational, Tech. & Adult Ed., Dist. 13*, 76 Wis. 2d at 240.  Therefore, we conclude that Murff did not meet her burden of proving the elements of her claim. *See Kowalchuk*, 234 Wis. 2d 203, ¶8.  Accordingly, we affirm the circuit court's order which upheld LIRC's decision dismissing Murff's claim for worker's compensation benefits.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.